**No. 25-14109**

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

BUILDING RESILIENT INFRASTRUCTURE &
DEVELOPING GREATER EQUITY, INC.,

*Plaintiff-Appellant*,

*v.*

CONSUMER FINANCIAL PROTECTION BUREAU *and*
RUSSELL VOUGHT, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:25-cv-1367
Hon. Thomas P. Barber

# Response Brief by Defendants-Appellees Consumer Financial Protection Bureau and Russell Vought, in his official capacity as Acting Director of the CFPB

MARK PAOLETTA
*Chief Legal Officer*
DANIEL SHAPIRO
*Deputy Chief Legal Officer*
VICTORIA DORFMAN
*Senior Legal Advisor*
CHRISTOPHER DEAL
*Deputy General Counsel for Litigation*
ANDREA MATTHEWS
*Assistant General Counsel for Litigation*

Joseph Frisone (VA Bar No. 90728)
Derick Sohn (DC Bar No. 1003386)
*Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Joseph.Frisone@cfpb.gov
Derick.Sohn@cfpb.gov
(202) 435-9287 (Frisone)
(202) 435-7873 (Sohn)

*Counsel for Defendants-Appellees Consumer Financial Protection Bureau and Russell Vought, in his official capacity as Acting Director of the CFPB*

Docket Number: 25-14109
Caption: BRIDGE v. CFPB

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. Rule 26.1, counsel for the Consumer Financial Protection Bureau (CFPB) and Russell Vought, in his capacity as Acting Director of the CFPB, certify that the Certificate of Interested Persons in Plaintiff-Appellant's Opening Brief is complete and accurate.

Dated: January 22, 2026

/s/ Joseph Frisone
Joseph Frisone

*Counsel for Defendants-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The Consumer Financial Protection Bureau (CFPB or Bureau) takes no position on whether this Court should schedule oral argument on Plaintiff-Appellant's appeal from the denial of its preliminary injunction motion. While the CFPB recognizes that oral argument may aid in this Court's resolution of the statutory and constitutional issues raised in this preliminary injunction appeal, the Bureau anticipates that the district court's imminent summary judgment ruling may obviate the need for argument on this appeal.

# TABLE OF CONTENTS


STATEMENT REGARDING ORAL ARGUMENT

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF THE CASE .......... 4

A. Background .......... 4

B. Procedural History .......... 13

STANDARD OF REVIEW .......... 15

SUMMARY OF ARGUMENT .......... 16

ARGUMENT .......... 20

I. BRIDGE is unlikely to succeed on the merits of any of its claims .......... 20

A. The CFPB acted within its authority under TILA in issuing the Rule. .......... 20

1. The CFPB acted within its authority under TILA in concluding that PACE transactions are covered by TILA .......... 21

2. The CFPB acted within its authority in applying Section 307 .......... 32

B. BRIDGE is unlikely to establish that the CFPB acted arbitrarily or capriciously in promulgating the Rule. .......... 36

C. BRIDGE is unlikely to succeed on its Tenth Amendment claim. .......... 41

II. BRIDGE cannot show that it will imminently suffer irreparable harm. .......... 45

III. The remaining factors weigh against preliminary relief. .......... 48

CONCLUSION ........................................................................................49

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........................................ 16

*Arizona Public Service Co. v. Snead*,
441 U.S. 141 (1979)........................................ 43

**AT&T Corp. v. Iowa Utils. Bd.*,
525 U.S. 366 (1999)........................................ 18, 30, 31

*Bilski v. Kappos*,
561 U.S. 593 (2010)........................................ 30, 31

*Callahan v. United States Dep't of Health & Hum. Servs. through Alex Azar II*,
939 F.3d 1251 (11th Cir. 2019) ........................................ 16

*Catalyst Pharms., Inc. v. Becerra*,
14 F.4th 1299 (11th Cir. 2021) ........................................ 24

*DeKalb Cnty. v. Fed. Hous. Fin. Agency*,
741 F.3d 795 (7th Cir. 2013) ........................................ 42

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)........................................ 36, 38

*Fla. Agency for Health Care Admin. v. Adm'r for Centers for Medicare & Medicaid Servs.*,
161 F.4th 765 (11th Cir. 2025) ........................................ 15

*Friends of Everglades v. S. Fla. Water Mgmt. Dist.*,
570 F.3d 1210 (11th Cir. 2009) ........................................ 27

*Gray Television, Inc. v. FCC*,
130 F.4th 1201 (11th Cir. 2025) ........................................ 39

*In re 2 Monkey Trading, LLC*,
142 F.4th 1323 (11th Cir. 2025) ........................................ 29

*In re Hero Loan Litig.*,
No. ED CV 1602478-AB (KKx), 2017 WL 3038250 (C.D. Cal. July 17, 2017)29

*In re Rosenfeld*,
23 F.3d 833 (4th Cir. 1994)........................................................................ 24, 25

*Lane Cnty. v. Oregon*,
74 U.S. 71 (1868) ........................................................................................ 41

*Long v. Sec'y, Dep't of Corr.*,
924 F.3d 1171 (11th Cir. 2019) .................................................................. 46

*LSSi Data Corp. v. Comcast Phone, LLC*,
696 F.3d 1114 (11th Cir. 2012) .................................................................. 15

*Meriwether v. Garrett*,
102 U.S. 472 (1880)...................................................................................... 41

*Midland States Bank v. Ygrene Energy Fund Inc.*,
564 F. Supp. 3d 805 (E.D. Mo. 2021)......................................................... 42

*Montgomery Cnty. Comm'n v. Fed. Hous. Fin. Agency*,
776 F.3d 1247 (11th Cir. 2015) ............................................................ 42, 43

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................................... 37

**Mourning v. Fam. Publ'ns Serv., Inc.*,
411 U.S. 356 (1973)........................................................................ 22, 23, 48

*Murphy v. NCAA*,
584 U.S. 453 (2018)...................................................................................... 44

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) ............................................................ 45, 48

*Nelson v. Campbell*,
541 U.S. 637 (2004)...................................................................................... 46

*Nesbitt v. Candler Cnty.*,
945 F.3d 1355 (11th Cir. 2020) .................................................................. 30

*Reno v. Condon*,
528 U.S. 141 (2000)............................................................................... 44

*Scroos LLC v. Att'y Gen. of United States*,
No. 6:20-cv-689-Orl-78LRH, 2020 WL 5534281 (M.D. Fla. Aug. 27, 2020) .. 46

*South Carolina v. Baker*,
485 U.S. 505 (1988)............................................................................... 44

*Swain v. Junior*,
961 F.3d 1276 (11th Cir. 2020) .................................................. 15, 16, 47, 48

*Tech Traders, LLC v. Insuladd Env't, Ltd*,
No.6:18-cv-754-Orl-40GJK, 2018 WL 5830568 (M.D. Fla. Nov. 7, 2020)...... 47

*United States v. Crape*,
603 F.3d 1237 (11th Cir. 2010) ............................................................. 25, 27

*United States v. Schwarzbaum*,
24 F.4th 1355 (11th Cir. 2022)................................................................... 41

*Vital Pharms., Inc. v. Alfieri*,
23 F.4th 1282 (11th Cir. 2022)................................................................... 47

*Wreal, LLC v. Amazon.com, Inc.*,
840 F.3d 1244 (11th Cir. 2016) ................................................................. 45

**Statutes**

5 U.S.C. § 706(2)(B)........................................................................ 14, 15

12 U.S.C. § 5512(a), (b)(1), (4)...................................................................... 8

15 U.S.C. § 1601(a) ..................................................................................... 48

15 U.S.C. § 1602(d) ....................................................................................... 7

15 U.S.C. § 1602(e) ....................................................................................... 7

15 U.S.C. § 1602(g) ....................................................................................... 7

15 U.S.C. § 1602(dd)(5)............................................................................ 9, 26

15 U.S.C. § 1602(f)............................................................................ 7, 17, 22

15 U.S.C. § 1602(i)........................................................................ 7, 17

15 U.S.C. § 1604 (1970)........................................................................ 7, 8

*15 U.S.C. § 1604(a) ........................................................................ 21

15 U.S.C. § 1604(f)........................................................................ 31

15 U.S.C. § 1612(b) ........................................................................ 13, 33

15 U.S.C. § 1639b(a)(2) ........................................................................ 48

15 U.S.C. § 1639c(a)........................................................................ 8

15 U.S.C. § 1639c(a)(1) ........................................................................ 8, 26

*15 U.S.C. § 1639c(b)(3)(C) ........................................................ 10, 27, 40, 48

15 U.S.C. § 1639c(b)(3)(C)(i)........................................................................ 4

15 U.S.C. § 1639c(b)(3)(C)(ii)........................................................ 10, 26, 29

15 U.S.C. § 1639c(b)(3)(C)(iii)........................................................................ 10

15 U.S.C. § 1640(a) ........................................................................ 13

Pub. L. No. 90-321, 82 Stat. 146 (1968)........................................................ 7

Pub. L. No. 115-174, 132 Stat. 1296 (2018) ................................................ 9

**Regulations**

12 C.F.R. § 1026.43(c)(1) ........................................................................ 33

12 C.F.R. § 1026.43(c)(2) ........................................................................ 9, 34

46 Fed. Reg. 20848 (Apr. 7, 1981)........................................................ 8

78 Fed. Reg. 6408 (Jan. 30, 2013)........................................................ 9

84 Fed. Reg. 8479 (Mar. 8, 2019) ........................................................ 10

*90 Fed. Reg. 2434 (Jan. 10, 2025).....2, 5-8, 10-13, 23, 24, 28, 31-35, 37-40, 46

**Other Authorities**

Black's Law Dictionary (12th ed. 2024). .................................................... 23, 24

## INTRODUCTION

Plaintiff-Appellant, Building Resilient Infrastructure & Developing Greater Equity, Inc. (BRIDGE), appeals from the district court's denial of a preliminary injunction in its challenge to a rule issued by the Consumer Financial Protection Bureau (CFPB or Bureau). It is unnecessary, however, for this Court to resolve BRIDGE's request for preliminary relief to preserve the status quo pending the issuance of a merits decision. That is because the district court has repeatedly committed to deciding the parties' fully-briefed cross-motions for summary judgment before the CFPB's rule goes into effect on March 1. Regardless, even if a merits decision were not imminent, BRIDGE has not shown any of the factors justifying preliminary relief.

This case is about the Truth in Lending Act's (TILA's) application to a particular kind of financial transaction known as Property Assessed Clean Energy (PACE) financing. PACE financing refers to voluntary agreements between a consumer and a local government—often partnering with a private PACE company—to fund home improvement projects. In return, the consumer agrees to repay the financing, with interest, in installments through an assessment on the consumer's home that is collected via the property tax system. Like other mortgage loans, PACE financing uses the consumer's home as collateral.

In 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA), which mandated that CFPB issue a rule that would apply two different TILA provisions to PACE financing: TILA's ability-to-pay requirements for mortgage loans and TILA's civil liability provision for violations of those requirements. After conducting a first-of-its-kind study on PACE financing using data from industry participants, the Bureau issued that rule in December 2024. *See* Residential PACE Financing Rule, 90 Fed. Reg. 2434, 2435 (Jan. 10, 2025) (PACE Rule or Rule). In doing so, the Bureau explained that because PACE financing meets TILA's definition of "credit" and is secured by the consumer's home, TILA's other consumer mortgage protections apply as well.

Not content with having its members follow the rules that apply to other residential mortgages, BRIDGE brought suit raising four claims under the Administrative Procedure Act (APA). BRIDGE sought a preliminary injunction based on three of those claims, which the district court denied after holding two hearings and considering supplemental briefing. This Court should affirm.

First, BRIDGE is unlikely to succeed on the merits of its claims. BRIDGE cannot show that the CFPB exceeded its statutory authority because PACE financing is plainly mortgage credit under TILA, and the Bureau faithfully implemented the EGRRCPA's instruction to apply certain TILA provisions while accounting for PACE financing's unique nature. BRIDGE is also unlikely to

succeed on its claim that the CFPB's consideration of its original study of PACE financing renders the Rule arbitrary and capricious because that study is neither flawed nor relevant to the particular aspects of the Rule that BRIDGE challenges. BRIDGE is also unlikely to succeed on its final claim that Section 307 and the Rule violate the Tenth Amendment, because the Rule regulates states' voluntary participation in a commercial activity—mortgage lending—and not the exercise of their taxing authority.

Second, BRIDGE cannot show that it needs preliminary relief to avoid any imminent irreparable injury. Any such claim is severely undermined by BRIDGE's lack of urgency in challenging the PACE Rule, having waited over five months before even filing suit. And finally, the balance of harms and public interest factors weigh against preliminary relief where the PACE Rule applies TILA's protections governing consumer mortgages to a new kind of mortgage lending, consistent with Congress's instruction to issue a rule governing PACE financing.

## STATEMENT OF THE ISSUES

1. Whether BRIDGE is likely to succeed on the merits of its claim that the CFPB exceeded its statutory authority in (a) determining that PACE transactions meet TILA's definition of "credit" and (b) implementing the EGRRCPA's mandate to apply certain TILA mortgage protections while accounting for PACE financing's unique nature.

2. Whether BRIDGE is likely to succeed on the merits of its claim that the Rule is arbitrary and capricious because it relied in part on a report that BRIDGE claims is flawed.

3. Whether BRIDGE is likely to succeed on the merits of its claim that EGRRCPA's Section 307 and the Rule, which regulate a particular kind of lending, violate the Tenth Amendment by unduly infringing on states' taxing authority or commandeering states into enforcing a federal program.

4. Whether BRIDGE has demonstrated that it would be irreparably harmed by the Rule absent a preliminary injunction despite waiting over five months after the Rule was issued before challenging it.

5. Whether BRIDGE has demonstrated that the balance of the equities and the public's interest weigh in favor a grant of preliminary-injunctive relief where Congress required the CFPB to engage in a PACE rulemaking.

## STATEMENT OF THE CASE

### A. Background

PACE Financing. Congress defines PACE transactions as "financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer." 15 U.S.C. § 1639c(b)(3)(C)(i). To facilitate PACE financing, states authorize local governments (or a government entity operating with the authority of several local governments) to enter into voluntary financing

agreements with consumers to fund certain energy efficient and weather-hardening home-improvement projects. 90 Fed. Reg. at 2435. At least 19 states and the District of Columbia have enabling legislation allowing residential PACE programs. *Id*. That said, only a few states have had active residential PACE programs—primarily California, Florida, and Missouri, with most PACE lending occurring in California and Florida. *Id*.

In nearly all cases, the local government will partner with a private PACE company, such as BRIDGE's members, to administer the PACE programs. *Id*. Typically, the PACE company handles the day-to-day operations of the program, including marketing PACE financing to consumers, training home improvement contractors to offer PACE loans as a financing option to consumers door-to-door, overseeing originations, performing underwriting, and making decisions about whether to approve PACE financing applications. *Id.*

In a typical PACE financing contract, the local government or, more commonly, the private PACE company, pays the contractor performing the work on the consumer's home. *See* Supp. App'x.0014[1]; *see also* Pl's. Br. at 7 ("Consumers pay no up-front costs; the [PACE company] administrator pays the

[1] Citations to "App'x" refer to the Appendix filed contemporaneously with Plaintiff-Appellant's opening brief. Citations to "Supp. App'x" refer to the Supplemental Appendix filed contemporaneously with the Defendants-Appellees' response brief. Citations to "ECF No." refer to this Court's docket in this case.

contractor once the consumer certifies completion [of the home improvement contract].”). In return, the homeowner agrees to repay the costs of the home improvement, with interest, through an assessment placed on the property that the homeowner pays alongside his property taxes. Supp. App’x.0015. These financing contracts provide for repayment ranging from five to 30 years, and the loans generally impose annual percentage rates several points higher than the prevailing mortgage rate. *See* 90 Fed. Reg. at 2435. These agreements further provide that the “rights and obligations” established under the contracts, “including the obligation to pay the Assessments,” are the “rights and obligations of the Property Owner.” *See, e.g.*, Supp. App’x.0264 (sample PACE financing contract from one of BRIDGE’s members).

Like other mortgages, PACE loans use the consumer’s home as collateral. 90 Fed. Reg. at 2435. Unlike a traditional mortgage, however, the resulting PACE lien placed on the consumer’s home typically has “super-priority” status under state law—giving PACE liens priority over other mortgage liens on the property, including preexisting ones. This means that if the consumer’s home is sold through foreclosure, sale proceeds will first go to any amounts past due on the PACE loan before any other mortgage debt. *Id*.

Further, when ownership of the property transfers to a new owner, the new owner becomes responsible for any remaining payment obligation on the PACE

loan. *Id*. However, due in part to guidelines issued by Fannie Mae and Freddie Mac, mortgage lenders generally will not originate loans for prospective home buyers to purchase homes with an existing PACE lien. *Id*. at 2449 n.121. For this reason, PACE companies warn consumers in their PACE financing agreements that the consumer may have to prepay their PACE loan in full in order to refinance or sell their home. *See* Supp. App'x.0015–16 n.6.

TILA and Regulation Z. Congress enacted TILA in 1968 to "assure a meaningful disclosure of credit terms so that the consumer [would] be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." Pub. L. No. 90-321, 82 Stat. 146 (1968). As relevant here, TILA applies to "consumer credit." "Consumer" refers to a "natural person" to whom "credit" is offered or extended for primarily personal, family, or household purposes. 15 U.S.C. § 1602(i). "Credit," in turn, is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *Id*. § 1602(f). A "creditor" includes a "government or governmental subdivision or agency." *Id.* § 1602(d), (e), (g).

Prior to the creation of the CFPB, TILA provided the Federal Reserve Board of Governors (Federal Reserve Board or Board) with the authority to "prescribe regulations to carry out the purposes" of TILA. Pub. L. No. 90-321, § 105; 15 U.S.C. § 1604 (1970). TILA also authorized the Board to make "adjustments and

exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate [TILA's] purposes[.]" *Id*. The regulation implementing TILA is known as Regulation Z.

Shortly after TILA's passage, the Board addressed the scope of TILA's definition of "credit" in a series of publicly issued staff letters. In one such letter from 1969, for example, Board staff explained that involuntary sewer assessments were not covered by TILA because the Act's definition of "credit" applied only to "debt[s]" that arose "from a contractual relationship, voluntarily entered into, between the debtor and creditor." Supp. App'x.0122. As the Board elaborated later, "certain transactions," like "tax assessments," did not "involve the right to defer a debt," and thus were not "credit" under TILA. 90 Fed. Reg. at 2448 (quoting 46 Fed. Reg. 20848, 20851 (Apr. 7, 1981)). In 1981, then, the Federal Reserve Board issued "official staff commentary" to Regulation Z codifying this position by stating that "tax assessments" are "not considered credit for purposes of the regulation." Supp. App'x.0129.

<u>The Dodd-Frank Act</u>. In 2010, Congress passed the Dodd-Frank Act, creating the CFPB and transferring to it the authority to enforce and prescribe regulations implementing TILA. *See* 12 U.S.C. § 5512(a), (b)(1), (4). Further, as a direct response to the mortgage crisis that precipitated the Great Recession, the Dodd-Frank Act amended TILA to strengthen consumer protections involving

"residential mortgage loans"—that is, "consumer credit" secured by a mortgage, 15 U.S.C. § 1602(dd)(5). In particular, TILA now requires that a creditor making "a residential mortgage loan" must ensure that "the consumer has a reasonable ability to repay the loan[.]" *Id.* § 1639c(a). To that end, Congress provided that, "[i]n accordance with regulations prescribed by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan." *Id.* § 1639c(a)(1).

The Bureau issued those regulations—known as the "Ability-to-Repay Rule"—on January 30, 2013. 78 Fed. Reg. 6408 (Jan. 30, 2013). As a result, before making a residential mortgage loan, a creditor generally must consider the consumer's (1) current or expected income or assets; (2) employment status; (3) monthly payment for the proposed credit; (4) monthly payment on any simultaneous loans the creditor should know about; (5) monthly payment for mortgage-related obligations; (6) debt obligations; (7) debt-to-income ratio; and (8) credit history. 12 C.F.R. § 1026.43(c)(2).

EGRRCPA. In 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act. Pub. L. No. 115-174, 132 Stat. 1296 (2018). In Section 307, Congress amended TILA—and specifically a section of TILA

governing mortgage credit—to address "underwriting requirements" for PACE financing. *See* 15 U.S.C. § 1639c(b)(3)(C). Congress provided that the Bureau "shall prescribe regulations that carry out the purposes of [TILA's ability-to-repay requirements] and apply [TILA's civil liability provisions] with respect to violations [of the ability-to-repay requirements] with respect to [PACE] financing, which shall account for the unique nature of [PACE] financing." *Id.* § 1639c(b)(3)(C)(ii). Congress also authorized the Bureau to "collect such information and data that the Bureau determines is necessary" to prescribe the regulations and directed the Bureau to "consult with State and local governments and bond-issuing authorities." *Id.* § 1639c(b)(3)(C)(iii).

<u>PACE Rulemaking</u>. Less than a year after the EGRRCPA was passed, the CFPB issued an Advance Notice of Proposed Rulemaking (ANPRM) requesting information to better understand the PACE financing market and the unique nature of PACE financing. 84 Fed. Reg. 8479 (Mar. 8, 2019). The ANPRM also solicited views on whether TILA and Regulation Z's provisions other than those listed in Section 307 should apply to PACE financing. *Id.* at 8482.

In October 2020, consistent with the EGRRCPA's authorization to collect information, the CFPB requested PACE financing data from all companies providing PACE financing at the time. 90 Fed. Reg. at 2440. The Bureau also contracted with one of the three nationwide consumer reporting agencies to obtain

credit record data for the PACE consumers in the transaction data received from the PACE companies. *Id*. In August 2022, the CFPB received de-identified PACE data and matching de-identified credit record data for about 208,000 individual PACE consumers in California and Florida. *Id*. In total, the matched consumers submitted about 286,000 PACE applications and entered into approximately 100,000 PACE transactions. *Id*.

Using those data, the Bureau published a report in May 2023, titled "Property Assessed Clean Energy (PACE) Financing and Consumer Financial Outcomes" (PACE Report). *See* Supp. App'x.0030. The report analyzes the impact of PACE transactions on consumer financial outcomes, with a particular focus on mortgage delinquency, by comparing consumers who had taken out a PACE loan and those who had a PACE loan application approved but ultimately chose not to proceed with the transaction. Among other things, the report found that taking out a PACE loan increased a consumer's probability of mortgage delinquency by 2.5 percentage points, or by 35%. Supp. App'x.0056–57.

<u>Final PACE Rule</u>. The CFPB issued the PACE Rule on December 17, 2024, and it was published in the Federal Register on January 10, 2025, with an effective date of March 1, 2026. 90 Fed. Reg. at 2434. As relevant here, the Rule does two things: First, using the Bureau's general rulemaking authority under TILA, the Rule explains that PACE loans meet TILA's definition of "credit" and are

therefore covered by the Act. In doing so, the Rule clarifies that the decades-old exception from Regulation Z's definition of credit for "tax liens" and "tax assessments" applies only to involuntary tax liens and assessments. *Id*. at 2443. The Bureau reasoned that the original rationale for this exception—that tax assessments do not involve a "contractual relationship, voluntarily entered into, between the debtor and creditor"—does not apply to voluntary tax assessments, which were not contemplated when the exception was created. *Id*. at 2448. The Rule thus makes clear that voluntary tax assessments, like PACE financing, could be TILA "credit" if they otherwise meet the term's definition.

The CFPB then concluded that was the case for PACE financing because consumers voluntarily agree to incur a debt (to cover the cost of the home improvement contract, *i.e.*, the PACE loan) and obtain the right to repay that debt over time (through years of property assessments). *Id*. at 2447. And because PACE loans meet TILA's definition of "credit" and are secured by the consumer's home, TILA's standard mortgage protections, like mandatory disclosures, will apply when the Rule takes effect. So too will provisions of other federal statutes, such as the Real Estate Settlement Procedure Act, whose protections apply to certain TILA-covered mortgage credit.

Second, the Rule applies TILA's ability-to-repay requirements and civil liability provisions to PACE loans after accounting for PACE loans' unique

characteristics, as required by Section 307 of the EGRRCPA. Specifically, the Bureau concluded that the existing ability-to-repay framework for other mortgage loans should largely apply to PACE loans, with certain adjustments, including to the factors that a PACE creditor has to consider when it knows that a consumer is repaying the PACE assessment via an escrow account for an existing mortgage. *Id*. at 2467. The Bureau likewise tailored the Rule's application of TILA's civil liability provisions. The Bureau started from the premise that TILA liability attaches to the "creditor" in TILA transactions, 15 U.S.C. § 1640(a); that the creditor for PACE loans is typically a local government; and that local governments are exempt from liability under TILA, *id*. § 1612(b). From there, the Bureau concluded that, in order to fulfill Congress's purpose of ensuring consumers have recourse for violations of TILA's ability-to-repay provisions as applied to PACE transactions, liability should extend to PACE companies that are substantially involved in making the credit decision. 90 Fed. Reg. at 2473.

**B. Procedural History**

On May 28, 2025, more than five months after the CFPB issued the PACE Rule, BRIDGE brought suit challenging the Rule under the Administrative Procedure Act (APA). App'x.0011. The complaint raises four claims: (1) that the CFPB exceeded its statutory authority; (2) that Section 307 and the Rule violate the

Tenth Amendment[2]; (3) that the Bureau issued the Rule without convening a small business review panel as required by the Regulatory Flexibility Act; and (4) that the Rule is arbitrary and capricious by relying in part on a report that BRIDGE alleges is flawed. App'x.0043–74.

On June 5, BRIDGE moved for a preliminary injunction on claims 1, 2, and 4. App'x.0005. After two hearings and supplemental joint briefing, the district court denied BRIDGE's motion on November 3, concluding that BRIDGE did not "establish a substantial likelihood of success on the merits and irreparable injury." *See* App'x.0007, 0543.

On November 19, BRIDGE appealed and filed a "time sensitive" motion for a preliminary injunction pending appeal in the district court. App'x.0008. The court denied that motion, explaining that it was "not well-taken in light of the amount of time that [BRIDGE] waited to initiate this lawsuit in the first place seeking injunctive relief, and the [district c]ourt's clearly articulated intention to expeditiously resolve the case before the [Rule] goes into effect on March 1, 2026." App'x.0573. The district court further concluded that, given its "expeditious approach," "the appeal of the denial of the motion for preliminary

[2] BRIDGE brings its Tenth Amendment challenge under the APA alleging the Rule is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). *See* App'x.0051.

injunction appears to be a waste of judicial resources, including…the Eleventh Circuit Court of Appeal's resources (as Plaintiff's strategy creates an unnecessary piecemeal appeal while the [district c]ourt's approach would result in one final appeal)." *Id*.

BRIDGE thereafter moved for an injunction pending appeal in this Court, which was denied on December 2. ECF No. 13. Meanwhile, the district court has pressed forward to expeditiously resolve this case on the merits. The court held a summary judgment hearing on December 16, and pursuant to the court's order at the end of that hearing, the parties separately submitted proposed orders on January 5, 2026. *See* Supp. App'x.0009–10.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Fla. Agency for Health Care Admin. v. Adm'r for Centers for Medicare & Medicaid Servs.*, 161 F.4th 765, 776 n.1 (11th Cir. 2025). In doing so, the Court reviews questions of law *de novo* and findings of fact under the clearly erroneous standard. *Id*.; *see also LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1119 (11th Cir. 2012).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Swain v. Junior*, 961 F.3d 1276, 1284 (11th Cir. 2020). To obtain one, the moving party must establish (1) a substantial likelihood of success on the merits;

(2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Callahan v. United States Dep't of Health & Hum. Servs. through Alex Azar II*, 939 F.3d 1251, 1257 (11th Cir. 2019). The third and fourth factors "merge when, as here, the government is the opposing party." *Swain*, 961 F.3d at 1293 (cleaned up).

Preliminary relief "may not be granted unless the movant clearly established the burden of persuasion as to the four requisites." *Callahan*, 939 F.3d at 1257. "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

## SUMMARY OF ARGUMENT

The district court's denial of a preliminary injunction in BRIDGE's challenge to the PACE Rule should be affirmed.

**First**, BRIDGE is unlikely to succeed on any of its three claims. To start, BRIDGE is not likely to succeed on its claim that the CFPB exceeded its statutory authority by applying more of TILA's mortgage protections to PACE financing than just those listed in Section 307 of the EGRRCPA. That is for the simple reason that PACE financing is credit under the plain text of TILA. After all, PACE transactions are loans offered and extended to homeowners that are repaid, with

interest, over years through an assessment placed on the consumer's property and that use the consumer's home as collateral. In the words of TILA's definition of "credit," PACE creditors grant "debtors" (here, the homeowners) the "right to incur debt" (the PACE loan) and "defer its payment" (repaid semi-annually or annually, alongside property taxes, for years). *See* 15 U.S.C. § 1602(f), (i).

BRIDGE claims that PACE financing is not TILA "credit" because the *property* is the "debtor," since PACE assessments attach to and run with the property. Nonsense. It is the consumer, not the property, who negotiates and signs the contract, who is responsible for repaying the PACE loans, and who suffers the consequences—risk of foreclosure—for failing to pay. In fact, the financing contracts that BRIDGE's members use, which BRIDGE conveniently ignores, expressly place the obligation to repay on the consumer.

BRIDGE's remaining arguments are similarly meritless. There is nothing in the EGRRCPA's text indicating that when Congress required the CFPB to apply certain of TILA's protections to PACE financing, Congress also prohibited, *sub silentio*, the CFPB from recognizing that because PACE financing is credit (specifically, mortgage credit), other TILA protections also apply. To the contrary, the EGRRCPA's text presupposes that PACE financing is mortgage credit. Nor does the Rule's conclusion that PACE financing is mortgage credit render EGRRCPA's Section 307 superfluous. As the Supreme Court has recognized, it is

not redundant for Congress to expressly "require" an agency to issue a rule that Congress had already authorized the agency to issue under an agency's general rulemaking authority. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 383 n.9 (1999).

BRIDGE is also unlikely to succeed on its claim that the CFPB exceeded its authority under Section 307 by failing to "account for" PACE financing's unique nature in applying certain TILA provisions to PACE financing. The Rule addresses each characteristic identified by BRIDGE as unique (and then some) and makes adjustments based on PACE's unique nature where appropriate.

Next, BRIDGE is unlikely to succeed on its claim that the Rule is arbitrary and capricious because of purported flaws in a report that the Bureau used primarily to quantify the impacts of the Rule. BRIDGE's primary complaint is that the report's analysis relied on an improper control group, but the Bureau picked the right control group for the purpose at hand. And the different analyses that BRIDGE contends the Bureau should have conducted are designed for a different, irrelevant task and too statistically flawed to accomplish even that. BRIDGE's other challenges to the report seek to fault the Bureau for reasonably relying on the data it had, or to overturn the Rule based solely on BRIDGE's disagreement with the Bureau's policy judgment. But the APA does not empower courts to invalidate agency action on these bases. And in any event, even if BRIDGE had identified

any genuine flaws in the report, BRIDGE still could not succeed on its arbitrary-and-capricious claim because the Bureau did not rely on the report in making any of the decisions BRIDGE challenges in this suit.

Finally, BRIDGE is unlikely to succeed on its last claim that Section 307 and the PACE Rule violate the Tenth Amendment by impermissibly infringing on states' taxing power and commandeering states into enforcing a federal program. That is because, at bottom, PACE financing is a credit transaction and not a tax. It is a voluntary, contractual arrangement for the loaning and repayment of money, not an involuntary impost levied by State sovereigns for general revenue-raising purposes. And rather than compelling states to enforce a federal program, Section 307 and the PACE Rule merely regulate states as market participants, requiring that PACE creditors follow the same rules for offering and making mortgage loans that bind their private sector competitors.

**Second**, the district court's denial should also be affirmed because BRIDGE cannot show that it needs preliminary relief to avoid any imminent irreparable injury. BRIDGE's claim that it requires immediate relief lacks credibility given the decided lack of urgency BRIDGE has repeatedly displayed in this litigation. And its claimed need for *preliminary* relief rests on nothing but speculation that the district court will fail to rule on the merits of this case before March 1—even though the parties have already presented their briefs, oral argument, and proposed

orders and the district court has "clearly articulated" its intention to grant final judgment before the Rule takes effect.

**Third**, the balance of harms and public interest factors weigh against reversing the district court here because granting a preliminary injunction would obstruct the Bureau's lawful implementation of consumer protections that Congress applied to PACE transactions.

The district court should be affirmed.

## ARGUMENT

### I. BRIDGE is unlikely to succeed on the merits of any of its claims.

BRIDGE's appeal should be denied first and foremost because it is unlikely to succeed on the merits of the three claims it presses here. First, the CFPB acted within its statutory authority in issuing the PACE Rule. Second, the PACE Report does not render the Rule arbitrary and capricious. And finally, Section 307 and the Rule do not violate the Tenth Amendment.

#### A. The CFPB acted within its authority under TILA in issuing the Rule.

BRIDGE claims that the CFPB exceeded its statutory authority in issuing the Rule in two ways: (1) by applying to PACE financing more of TILA's consumer mortgage protections than those listed in EGRRCPA's Section 307 and (2) by failing to account for PACE financing's unique nature in implementing Section 307. BRIDGE is unlikely to succeed on either claim.

### 1. The CFPB acted within its authority under TILA in concluding that PACE transactions are covered by TILA.

PACE financing meets TILA's definition of consumer "credit." And because PACE loans are TILA credit secured by a mortgage, the CFPB did not exceed its statutory authority in issuing a rule that makes clear that TILA's mortgage protections apply to PACE transactions.

BRIDGE's contrary argument starts with a simple and uncontroversial premise: "[A]n agency's power is limited to the authority delegated to it by Congress, and an agency literally has no power to act unless Congress authorizes it to do so." Pl's. Br. at 31 (cleaned up). The CFPB agrees. Where BRIDGE falters, however, is by looking solely at Section 307 as the source of the Bureau's authority to act. BRIDGE claims (at 32) that "[n]othing in Section 307's text authorizes CFPB to determine PACE is a mortgage and apply nearly all TILA provisions to PACE." But the CFPB did not rely on Section 307 to conclude that PACE financing is mortgage credit that is generally covered by TILA. Rather, the CFPB relied on its longstanding rulemaking authority under TILA to "prescribe regulations to carry out the purposes of [TILA]," 15 U.S.C. § 1604(a), and faithfully applied TILA's definition of "credit."

As the Supreme Court recognized shortly after TILA's passage, this rulemaking authority was specifically designed to ensure that TILA would cover "not only … the myriad forms in which credit transactions then occurred, but also

… those which would be devised in the future." *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 364–65 (1973). This, the Supreme Court found, would help "deal with" creditors who attempt to "eva[de]" TILA's reach by purporting to "characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish." *Id*. Here, the CFPB used this authority to clarify that PACE financing meets TILA's longstanding definition of consumer "credit," a straightforward conclusion that is only reinforced by Section 307 of the EGRRCPA.

**a.** TILA defines "credit" as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). And a "consumer" credit transaction is "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id*. § 1602(i). PACE loans are plainly consumer credit. PACE lenders offer consumers money to pay for home improvement projects; if consumers accept the deal, they repay the loan in installments over time through assessments placed on the property. In other words, PACE creditors grant debtors (here, the

homeowners) the right to incur debt (the PACE loan) and defer its payment (repaid semi-annually or annually, alongside property taxes, for years).[3]

BRIDGE's primary counterargument (at 39–40) is that the consumer is not the "debtor" for purposes of TILA because the repayment mechanism for PACE loans—a PACE assessment—attaches to and runs with the property. In BRIDGE's telling, it is the property that is the "debtor." *Id*. BRIDGE is wrong.

Start with the beginning of the transaction. The "party to whom credit is offered or extended" is in fact a consumer: the homeowner. PACE loans are frequently marketed "directly" to homeowners, "often door-to-door." 90 Fed. Reg. at 2435. The homeowners are offered the loans and sign the financing agreements. *See* App'x.0289 (example of a PACE contract providing that "This Assessment Contract … is by and between the California Statewide Communities Development Authority and … *the Property Owner*" (emphasis added)). The underlying real property, on the other hand, is not a legal entity that can enter into contracts.

Nor is the property the "debtor" in PACE transactions. "Debtor" is not defined in TILA, but it is commonly understood as "[s]omeone who owes an obligation to another" especially "an obligation to pay money." *Debtor*, Black's

[3] Contrary to BRIDGE's claim (at 37), this is not a "post-hoc reinterpretation of TILA's 1968 definition." There is no reinterpretation. Rather, the CFPB is merely applying the existing definition to a new form of credit transaction. *See Mourning*, 411 U.S. at 364–65.

Law Dictionary (12th ed. 2024); *see also Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021) (Courts "interpret words that are not defined in a statute with their ordinary and plain meaning"). BRIDGE similarly defines (at 39) "debtor" as "one who owes or is indebted to another." That is the consumer in these transactions.

It is the homeowner—not the property—who is obligated to pay the PACE loan each time the assessment comes due. *See* Supp. App'x.0236 (sample PACE contract stating that the "Property Owner will be responsible for payment of the Assessment"). Moreover, if the homeowner doesn't pay, the homeowner will suffer the consequences—namely, the risk of losing the home in a tax sale or a foreclosure. To be sure, if the homeowner does not pay the assessment, the lender's remedy is foreclosure on the house rather than a lawsuit directly against the homeowner. But that these loans are nonrecourse does not change the fundamental fact that the consumer is still obligated to pay. Indeed, as the CFPB explained in the Rule, "TILA explicitly treats other nonrecourse obligations as consumer credit," such as nonrecourse reverse mortgages and mortgages that are effectively nonrecourse under State anti-deficiency statutes. 90 Fed. Reg. at 2448.

Similarly, it does not matter that the obligation to pay the assessment runs with title to the property. That just means that the obligation to repay passes to the future owners of the property, not that the property itself is the debtor. *See, e.g.*, *In*

*re Rosenfeld*, 23 F.3d 833, 837 (4th Cir. 1994) (concluding that because an obligation to pay assessments was imposed by a "covenant running with the land," that obligation was "a function of owning the land with which the covenant runs" that bound the next owner).

BRIDGE attempts to dance around this by arguing (at 41) that what matters is the "legal responsibility" to repay the PACE loan. But legal responsibility falls on the homeowner. We know this because BRIDGE's members' contracts say so. For example, those contracts state that the "Property Owner agrees to pay the Assessments levied under th[e] Assessment Contract to pay for the cost of the Project," Supp. App'x.0262, and the "rights and obligations" established under the contract, "including the obligation to pay the Assessments," are the "rights and obligations of the Property Owner," Supp. App'x.0264.

PACE financing thus meets TILA's definition of "consumer credit."

**b.** This conclusion is reinforced by Section 307 of the EGRRCPA. *See United States v. Crape*, 603 F.3d 1237, 1243 (11th Cir. 2010) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). To start, there's the fact that Congress placed Section 307 not only in TILA but in a section regulating mortgage credit. That legislative choice is hard to square with

BRIDGE's assertion (at 36) that Congress recognized that "PACE stood entirely outside of TILA's regime."

More importantly, there's the language of Section 307 itself, which presupposes that PACE financing is mortgage credit. Here's how: Section 307 required the CFPB to "prescribe regulations that…apply [TILA's civil liability provisions] with respect to violations under [TILA's ability-to-repay provision] with respect to [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii). The key language here is "with respect to violations under" TILA's ability-to-repay provision. That's because the only way to violate the ability-to-repay provision is for a "creditor" to "make a residential mortgage loan" without the requisite determination that the consumer has a reasonable ability to repay the loan. *Id*. § 1639c(a)(1) (emphasis added). Thus, Congress instructed the Bureau to apply TILA's civil liability provisions to PACE financing with respect to violations under a section of TILA that applies only to residential mortgage loans. If PACE financing were not a residential mortgage loan, which TILA defines as credit, *id*. § 1602(dd)(5), there could be no violations of the ability-to-repay provision. Section 307 thus reflects Congress's recognition of PACE financing for what it plainly is: mortgage credit.

BRIDGE argues otherwise, claiming (at 36) that Section 307 represents some "middle road" approach where Congress limited TILA's application to only

those provisions in Section 307. But neither BRIDGE's textual arguments nor its speculation about Congress's motivation in passing Section 307 have any merit.

BRIDGE's primary textual support is to misleadingly assert (at 36) that "Congress recogni[zed] that PACE is a 'tax assessment.'" But Congress actually said:

> (C) Consideration of underwriting requirements for Property Assessed Clean Energy financing
>
> (i) Definition
>
> In this subparagraph, the term "Property Assessed Clean Energy financing" means financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer.

15 U.S.C. § 1639c(b)(3)(C). Congress plainly defined PACE as "financing" that "results in" a tax assessment. *Id*. BRIDGE points to nothing else in Section 307's text to argue that Congress intended to limit TILA's application to PACE financing to "only" those TILA provisions listed in Section 307. In fact, had Congress wanted to so limit TILA's application, it easily could have said so, but it didn't. *See Crape*, 603 F.3d at 1245 ("And we will not attribute words to Congress that is has not written."); *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) (refusing to add the word "any" to a definition because Congress "knows how to use th[at] term" and did not).

With no textual support, BRIDGE next claims (at 35) that Congress intended to except PACE financing from TILA's definition of "credit" because Congress

passed Section 307 "in light of the uniform understanding that PACE was *not* consumer 'credit' under TILA." Not so. And again, BRIDGE omits key details. First, BRIDGE relies on the Federal Reserve Board (which had primary rulemaking authority for TILA prior to the CFPB's creation) excepting tax liens and tax assessments from TILA's definition of "credit." *See* 90 Fed. Reg. at 2448. That happened in 1981. *Id*. PACE financing did not exist until 2008. *Id*. at 2437. Second, BRIDGE ignores why the Board made this exception: The Board (correctly) reasoned that TILA "credit" requires a voluntary, contractual relationship, and the tax liens and assessments known to the Board at the time were involuntary. *See*, *e.g.*, Supp. App'x.0122 (1969 Board letter concluding involuntary sewer assessments were not TILA "credit"). Thus, concluding that PACE loans—voluntary, contractual agreements—meet TILA's definition of "credit" is consistent with, not contrary to, the backdrop against which Congress enacted Section 307.

Beyond that, this backdrop reinforces that Section 307's mandate does not undermine the CFPB's conclusion that PACE financing meets TILA's definition of "credit." Before Congress passed Section 307 and the Bureau implemented it, Regulation Z's 1981 exception for "tax assessments" created "ambiguity" about TILA's application to PACE transactions. 90 Fed. Reg. at 2450. Case in point: The one court to consider whether PACE transactions were subject to TILA's

protections prior to the EGRRCPA relied in part on Regulation Z's exception for tax assessments in concluding that they do not. *See In re Hero Loan Litig.*, No. ED CV 1602478-AB (KKx), 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017). Recognizing that PACE financing's novel features are inconsistent with the 1981 tax assessment exception's rationale, the Rule clarified that the exception applies only to "involuntary tax assessments" and that voluntary tax assessments can be TILA "credit" if they otherwise meet that definition. *Id.* As explained above, PACE financing does meet that definition.

**c.** BRIDGE's remaining arguments are similarly meritless. To start, Section 307 does not control merely because it is the later-enacted, more specific statute. As this Court has held, "there is no need to engage in a general/specific canon analysis" when there is no "conflict" between the relevant statutory provisions. *See In re 2 Monkey Trading, LLC*, 142 F.4th 1323, 1334 (11th Cir. 2025). Here, there is no conflict between Section 307 and the commonsense conclusion that PACE financing is consumer credit. Section 307 requires the CFPB to apply TILA's ability-to-repay and civil liability provisions to PACE loans, accounting for their unique characteristics. 15 U.S.C. § 1639c(b)(3)(C)(ii). The Rule does precisely that. To be sure, the Rule goes further and confirms that other TILA mortgage protections also apply to PACE financing since PACE transactions are a form of

mortgage credit. But the application of those additional protections in no way conflicts with Section 307.

Nor does recognizing that PACE financing is TILA "consumer credit" render Section 307 superfluous or a nullity. BRIDGE surmises (at 37–38) that Congress would have had no reason to pass Section 307 if TILA already applied to PACE financing. But "statutory interpretation cannot be overcome by judicial speculation as to the subjective intent of various legislators in enacting [a] subsequent provision." *Bilski v. Kappos*, 561 U.S. 593, 608 (2010). "[I]t is better to analyze a statute than it is to psychoanalyze Congress." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1361–62 (11th Cir. 2020). And here, an analysis of the relevant statutory provisions shows that Section 307 is not superfluous.

First, as the Supreme Court has recognized, it is not "redundant" for Congress to "*require*[]" an agency to issue a rule that it could have already issued under its general rulemaking authority. *See AT&T Corp.*, 525 U.S. at 383 n.9. That is exactly what happened here. The fact that Section 307 *required* the Bureau to issue a rule applying TILA's ability-to-repay and civil liability provisions to PACE transactions does not mean that the Bureau was not already *authorized* to regulate PACE transactions as credit.

Second, by specifically requiring the Bureau to issue such a rule (as opposed to generally authorizing it), Section 307 limited the Bureau's rulemaking options in

another way. As part of the Bureau's preexisting rulemaking authority under TILA, the agency may "exempt, by regulation, from all or part of [TILA] all or any class of transactions." 15 U.S.C. § 1604(f). Section 307, however, would preclude the Bureau from exempting PACE transactions from TILA's ability-to-repay and associated civil liability provisions, as doing so would actually conflict with Section 307.

Third, just as in *AT&T*, Section 307 "gives the [CFPB] authority beyond that conferred by" TILA's general rulemaking authority. 525 U.S. at 383 n.9. Section 307's instruction to "account for [PACE] financing's unique nature" gave the Bureau the authority to extend TILA's civil liability provision to PACE companies, even though liability under TILA typically applies to only creditors, and the creditors in PACE transactions are local government entities, which TILA exempts from civil liability. *See* 90 Fed. Reg. at 2473. This is something the Bureau could not do under its general rulemaking authority. The CFPB's conclusion that PACE financing meets TILA's definition of "credit" therefore does not render Section 307 superfluous or a nullity.

BRIDGE largely ignores this analysis and instead analogizes this case to the Supreme Court's decision in *Bilski*, a patent case that does not address agency rulemaking authority. There, the Court rejected an interpretation of an earlier statute that would have rendered a defense provided in a later statute completely

unavailable—making the later statute a true nullity, because individuals would not have been able to make use of a specific defense that Congress provided. 561 U.S. at 600. However, as discussed above, nothing about the CFPB's conclusion that PACE financing meets TILA's definition of "consumer credit" renders Section 307 inoperative. Section 307 forced the CFPB to engage in a rulemaking to address PACE financing, gave the Bureau additional authority to tailor particular provisions of TILA to PACE financing, and constrains the Bureau's exception authority going forward.

For these reasons, BRIDGE is unlikely to succeed on its claim that the CFPB exceeded its statutory authority by concluding that PACE financing is TILA "credit" and thus applying more of TILA's mortgage protections to PACE financing than those listed in Section 307.

**2. The CFPB acted within its authority in applying Section 307.**

BRIDGE is also unlikely to succeed on its claim that the CFPB exceeded its statutory authority in implementing Section 307 by failing to "account for" PACE financing's unique nature. Specifically, BRIDGE claims (at 34) that the CFPB "ignor[ed]" several of PACE financing's unique characteristics in applying Section 307. But the record shows that the CFPB considered each factor BRIDGE lists, made adjustments to TILA's ability-to-repay and civil liability

provisions based on PACE's unique nature as warranted, and explained its reasoning in detail. *See* 90 Fed. Reg. at 2464-66. Section 307 requires no more.

Start with the civil liability provisions, which Plaintiff ignores. The Rule's tailoring of TILA's civil liability scheme to PACE financing was expressly predicated on the unique fact that in PACE transactions, the "creditor" for purposes of TILA is the local government entity and not the private PACE company. This is important because while TILA provides a private right of action against "creditors," TILA also insulates local government entities from civil penalties. *See* 15 U.S.C. § 1612(b). Thus, applying TILA's civil liability provisions to PACE transactions without any adjustments could frustrate Congress's instruction in Section 307 by leaving consumers without any remedy for violations of TILA's ability-to-repay provision with respect to PACE transactions. Accounting for this unique characteristic of PACE transactions, the PACE Rule extends liability to PACE companies that are substantially involved in making the credit decision. 90 Fed. Reg. at 2473.

Next is TILA's ability-to-repay requirement, which mandates that mortgage lenders make a "reasonable and good faith determination … that the consumer will have a reasonable ability to repay the loan" before originating the loan. 12 C.F.R. § 1026.43(c)(1). In making that determination, creditors must consider, at a minimum, the consumer's (1) current or expected income or assets; (2)

employment status; (3) monthly payment for the proposed credit; (4) monthly payment on any simultaneous loans the creditor should know about; (5) monthly payment for mortgage-related obligations; (6) debt obligations; (7) debt-to-income ratio; and (8) credit history. *Id*. § 1026.43(c)(2). The CFPB considered PACE's unique characteristics and determined that certain adjustments to this framework were warranted. *See* 90 Fed. Reg. at 2464–66.

In particular, recognizing that PACE loans are repaid alongside property taxes and that many consumers will make such payments through an escrow account for an existing mortgage, the Rule directs PACE creditors to consider the timing of a consumer's first PACE loan payment for these consumers. 90 Fed. Reg. at 2468. This is because the CFPB found that, due to a potential lag in a mortgage servicer accounting for the new PACE loan, by the time a consumer's first PACE payment is due, there may be a (substantial) shortfall in the consumer's escrow account, requiring the consumer to make a considerably higher mortgage payment to make up the difference. *Id*. Given that this situation is unique to PACE lending, the Rule instructs PACE creditors to consider it when evaluating the consumer's ability to repay the PACE loan. *Id*. That this portion of the Rule requires PACE lenders to exercise more diligence, not less, may not be how BRIDGE would have adjusted the existing ability-to-repay framework. But

there is no serious argument that in enacting this portion of the Rule, the CFPB did not "account for the unique nature of PACE financing."

The CFPB also considered the other characteristics BRIDGE listed and explained why they did not merit changing the existing framework applicable to other mortgage loans. Take, for instance, the fact that PACE loans are repaid through tax assessments, or that PACE loans further public-policy goals, or that the creditor in a PACE loan is typically the local government. *See* Pl's. Br. at 33–34. BRIDGE does not explain, and the CFPB saw no reason, why these factors should mean that creditors should not check a consumer's monthly income, employment status, or expected monthly payment before making the PACE loan. The same is true of BRIDGE's conclusory claims (at 34) that the ability-to-repay framework should be adjusted to account for the fact that some state and local governments have already adopted some consumer protections, or that some PACE companies voluntarily apply underwriting practices to ensure consumers can repay the loan. The CFPB considered these characteristics and reasonably concluded that they do not militate against applying a uniform national ability-to-repay requirement for all consumers. *See* 90 Fed. Reg. at 2465. After all, as the CFPB explained in the Rule, not all states with PACE-enabling legislation have comparable requirements; new states may enable PACE lending without enacting

such requirements; and future PACE companies that enter the market may not voluntarily follow best practices not required by law. *See id*.

BRIDGE can point to no statutory text suggesting that the CFPB's thorough consideration of these factors, in combination with the changes the CFPB made to the ability-to-pay framework and corresponding civil liability provision specifically for PACE financing, does not satisfy Section 307's requirement to "account for" PACE financing's unique characteristics. For these reasons, BRIDGE is unlikely to succeed on its claim that the CFPB exceeded its statutory authority in applying Section 307.

**B. BRIDGE is unlikely to establish that the CFPB acted arbitrarily or capriciously in promulgating the Rule.**

BRIDGE's claim that purported flaws in the CFPB's PACE Report render the rule arbitrary and capricious is also unlikely to succeed. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). BRIDGE's assertion (at 43–48) that the CFPB erred in relying on a purportedly flawed analysis in the PACE Report is doubly wrong: BRIDGE has not identified any genuine problems in the Report's analysis or conclusions and, even if any such problems did exist, they would be irrelevant because the CFPB did not rely on the Report in reaching the decisions that BRIDGE challenges.

In asserting that the Report was flawed, BRIDGE first incorrectly argues (at 44) that the PACE Report "utilized an improper control group" when it compared consumers who obtained PACE loans to PACE-approved consumers who did not. That was the right comparison for the Bureau's purpose of quantifying "the overall impact of PACE loans on consumer financial outcomes." 90 Fed. Reg. at 2481. BRIDGE therefore misses the mark in suggesting (at 44–45) that the Bureau's analysis "ignore[d]" the fact that "pay[ing] for home projects through PACE" put consumers in a "materially different financial position." Far from ignoring that impact, the Bureau conducted an analysis reasonably designed to *measure* it.

Ironically, it is BRIDGE's preferred analysis that would have ignored critical aspects of how obtaining PACE loans materially impacts consumers' financial position. In particular, BRIDGE contends (at 45–46) that the Bureau should instead have compared PACE loans to other types of financing. But, as the Bureau explained in the Rule, that analysis would have ignored, for instance, the impact of "induc[ing] consumers into undertaking a home improvement project in the first place, or into financing a project that they might otherwise pay cash for." 90 Fed. Reg. at 2481. In other words, the Bureau properly declined to adopt BRIDGE's approach because it would have "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And besides, any analysis based on BRIDGE's preferred

comparison would have been too flawed to be useful because the alternate control group would have been "too small to have [the necessary] statistical power" or been composed of consumers who had (among other things) markedly higher credit scores and dramatically lower pre-PACE delinquency rates than consumers who obtained PACE financing. 90 Fed. Reg. at 2481.

BRIDGE fares no better in arguing (at 46–47) that the Bureau did not adequately consider the impact of "state-level" reforms on PACE financing. The Bureau lacked any data about Florida's 2024 reforms, which went into effect after the PACE Report was completed and the proposed rule had been published, but it acknowledged the relevance of California's 2019 reforms and separately analyzed pre- and post-reform data to understand their impact. 90 Fed. Reg. at 2476–78. Tellingly, BRIDGE raises no quarrel with the substance of that analysis. BRIDGE instead complains (at 47) that the Bureau's data about the post-reform period was limited and "not statistically precise." But the APA does not require "agencies to conduct or commission their own empirical or statistical studies" at all, let alone require agencies to obtain "perfect empirical or statistical data" before making a decision. *Prometheus Radio Project*, 592 U.S. at 427. And the Bureau's decision to proceed without collecting new data about the Florida reforms was particularly appropriate in light of its reasonable conclusion that reforms in some states did not make the uniform national protections that Congress enacted in TILA less

meaningful. 90 Fed. Reg. at 2449. Accordingly, the Bureau did not act arbitrarily or capriciously in making "a reasonable … judgment based on the evidence it had." *Prometheus Radio Project*, 592 U.S. at 427.

Next, BRIDGE asks (at 47–48) this Court to strike down the Rule because BRIDGE disagrees with the Bureau's assessment of the relative importance of regulating PACE loans. Specifically, BRIDGE contends (at 48) that the Rule cannot be "justif[ied]" because BRIDGE thinks that the Report's finding that PACE loans are associated with a 35% increase in mortgage delinquency rates, 90 Fed. Reg. at 2436, represents only a "negligible" impact on consumer financial outcomes. But that is not an argument that the Bureau failed to examine relevant data or consider the relevant issues as BRIDGE (at 48) claims. It is instead a request that this Court impermissibly "substitute [its] judgment for that of the" Bureau. *See Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1212 (11th Cir. 2025) (cleaned up).

BRIDGE's final contention (at 48–49) that the Bureau acted unreasonably in omitting from its analysis PACE applicants who could not be matched to credit histories simply ignores the explanations the Bureau provided in the Rule. The Bureau explained that failures to match were likely explained by "data issues" such as out-of-date addresses or errors in the identifying information provided by PACE companies. 90 Fed. Reg. at 2479. BRIDGE disagrees, noting that PACE loans do

not appear on consumer's credit reports and hypothesizing (at 48) that unmatched applicants likely didn't have credit histories and were therefore likely less creditworthy than their matched counterparts. But as the Bureau explained in the Rule, BRIDGE's theory makes very little sense because while PACE loans do not appear on credit reports, mortgages do. 90 Fed. Reg. at 2479. Accordingly, the Bureau explained it was "unlikely" that unmatched consumers lacked credit histories entirely "since PACE borrowers must be homeowners and most home purchases are funded by mortgages." *Id.*; *see also id.* at 2479 n.253 (citing publicly available data). BRIDGE is therefore quite wrong to assert (at 49) that "there is no support in the 'administrative record' or any 'articulated' reasoning" to support the Bureau's conclusion that data quality drove most of the failures to match.

In any event, even if BRIDGE had identified any genuine flaws in the PACE Report's analysis (it has not), they would be beside the point. BRIDGE is wrong to contend (at 44) that the Report was central to the Bureau's "justification" for the Rule. In fact, the Report plainly had nothing to do with the Bureau's application of TILA's ability-to-repay and civil liability provisions to PACE loans, which was mandated by Congress. 15 U.S.C. § 1639c(b)(3)(C). Nor did it impact the Bureau's legal conclusion that PACE loans are credit under the same statute. 90 Fed. Reg. at 2443–50. Even if BRIDGE were correct that the PACE Report overstated the risks of PACE financing, that would not undermine the Bureau's conclusion that "TILA

applies *regardless* of the current level of risk in any specific credit market," 90 Fed. Reg. at 2450 (emphasis added). It is therefore "clear" that BRIDGE's complaints about the PACE Report's methodology "ha[ve] no bearing on … the substance of [the] decision[s]" at issue in this suit. *United States v. Schwarzbaum*, 24 F.4th 1355, 1366 (11th Cir. 2022). That alone would be fatal to BRIDGE's arbitrary-and-capricious claim even if the PACE Report had been flawed. *Id.*

For all of the foregoing reasons, BRIDGE is unlikely to succeed on its arbitrary-and-capricious claim.

**C. BRIDGE is unlikely to succeed on its Tenth Amendment claim.**

Finally, BRIDGE is unlikely to succeed on its claim that Section 307 and the Rule violate the Tenth Amendment by impermissibly infringing on states' taxing power or commandeering states into enforcing a federal program. To start, as BRIDGE conceded below, both issues hinge on whether PACE financing is a "commercial activity or … a tax." App'x.0507–08. And PACE financing is plainly not a tax.

The Supreme Court has long distinguished between taxation, which is an involuntary "impost[] levied for the support of the government," and the creation of debt, which is "founded upon contract." *Meriwether v. Garrett*, 102 U.S. 472, 513 (1880). The case on which BRIDGE relies makes the same point: a "tax is an

impost levied by authority of government upon its citizens[; i]t is not founded on contract or agreement." *See Lane Cnty. v. Oregon*, 74 U.S. 71, 80 (1868).

PACE loans are created voluntarily by contract with individual homeowners. They are not imposts levied on the general public for revenue-raising purposes. In fact, one of BRIDGE's members made this exact point in another federal case, explaining that PACE assessments "are not a state tax … because they are not used for general revenue …[; r]ather, PACE assessments are levied as a repayment mechanism for the … financing of energy efficiency and renewable energy improvements." *Midland States Bank v. Ygrene Energy Fund Inc.*, 564 F. Supp. 3d 805, 813, 815 (E.D. Mo. 2021) (reciting BRIDGE's member's argument and agreeing that PACE assessments are not taxes under state law).

However, even assuming PACE financing *implicates* states' taxing authority because PACE assessments are collected alongside property taxes, Section 307 and the Rule would not run afoul the Tenth Amendment because they do not meaningfully affect states' taxing powers. The Rule does not prohibit states from imposing tax assessments, nor does it impose any burdens or restrictions on states' collection of those assessments. The Rule merely regulates the conditions under which PACE loans are offered and extended.

And even if the PACE Rule did minimally encroach on states' taxing power, Congress has broad authority to preempt such power under the Commerce Clause.

As this Court succinctly put it: "[T]he federal commerce power supersedes state tax authority." *Montgomery Cnty. Comm'n v. Fed. Hous. Fin. Agency*, 776 F.3d 1247, 1261 (11th Cir. 2015). Other circuits are in accord. *See*, *e.g.*, *DeKalb Cnty. v. Fed. Hous. Fin. Agency*, 741 F.3d 795, 801 (7th Cir. 2013) ("No provision of the Constitution insulates state taxes from federal powers granted by the Constitution.").

BRIDGE ignores this controlling authority, instead spending pages (49–53) waxing poetic about states' taxing power. BRIDGE is forced to rely on antiquated cases to claim (at 53) that there is "nothing in the Constitution which contemplates or authorizes any direct abridgment of" states' "taxation of property, business, and persons." But that assertion flies in the face of Supreme Court and Eleventh Circuit precedent. In particular, the Supreme Court has held that a federal statute can be "construed to invalidate" a state tax, given "the broad power of Congress to regulate interstate commerce." *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 150 (1979). And far from invalidating a state tax (again, assuming PACE assessments are taxes), the alleged infringement here is merely the reduction in assessments due to the potential reduction in executed PACE loans.

This case is thus similar to *Montgomery County Commission*, where this Court rejected a Tenth Amendment challenge to a federal law excepting certain federal entities from state land transfer taxes. There, it was not a Tenth Amendment

violation when Congress removed a class of entities from the pool of taxable subjects. 776 F.3d at 1258. Here, there is no Tenth Amendment violation merely because, as a result of the PACE Rule, there may be fewer taxable subjects, i.e., consumers who would otherwise be eligible for PACE loans but for TILA's ability-to-repay requirements. Accordingly, any infringement here would be entirely consistent with Congress's power under the Commerce Clause.

BRIDGE's anticommandeering argument fares no better. Again, fatal to BRIDGE's argument is that PACE loans are not a tax. But even assuming they are, there is still no anticommandeering problem because that doctrine does not apply where, as here, Congress does not regulate "States in their sovereign capacity to regulate their own citizens," but rather as voluntary participants in a generally applicable regulatory scheme. *See Reno v. Condon*, 528 U.S. 141, 151 (2000); *see also Murphy v. NCAA*, 584 U.S. 453, 475–76 (2018) (finding no anticommandeering violation where "Congress evenhandedly regulates an activity in which both States and private actors engage"). Indeed, it is well settled that the fact "[t]hat a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity … presents no constitutional defect." *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988).

That is the case here. Section 307 of the EGRRCPA and the PACE Rule govern a commercial activity, imposing obligations on "creditors" engaged in offering and extending "credit" as defined by TILA. They do not compel states to engage in that commercial activity or otherwise enforce a federal regulatory program against their citizens. Rather, they merely require local governments to follow the generally applicable federal requirements for consumer lending.

Accordingly, Section 307 and the PACE Rule do not violate the Tenth Amendment.

## II. BRIDGE cannot show that it will imminently suffer irreparable harm.

BRIDGE has failed to demonstrate the imminent irreparable harm necessary to obtain injunctive relief. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted). Because BRIDGE appeals the denial of a preliminary injunction, its claimed injury must be "imminent," as "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Accordingly, "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of

irreparable harm." *Id.* Here, any assertion that BRIDGE is at risk of imminent injury is belied by BRIDGE's own litigation conduct.

BRIDGE cannot credibly claim it needs a preliminary injunction to avoid imminent irreparable injury because it has repeatedly declined to act with the urgency required to substantiate such a claim. BRIDGE asserts (at 61–64) that its members will suffer two categories of injury—namely, compliance costs and a reduction in business volume—unless the Rule is enjoined before its March 1, 2026 effective date. But BRIDGE knew about that date in December 2024, when the Rule was issued. 90 Fed. Reg. at 2434. Yet BRIDGE waited more than five months to even file suit. *See* App'x.0011. And when its motion for a preliminary injunction was denied, it then waited more than two weeks to file this appeal. *See* App'x.0544 (Nov. 3, 2025 Order Denying Preliminary Injunction); ECF No. 1 (reflecting Nov. 19, 2025 Notice of Appeal). That unhurried pace means that any harm that BRIDGE's members suffer before the district court rules on the merits of its claims are "[s]elf-inflicted wounds" that "do not constitute irreparable harm." *Scroos LLC v. Att'y Gen. of United States*, No. 6:20-cv-689-Orl-78LRH, 2020 WL 5534281, at *3 (M.D. Fla. Aug. 27, 2020) (citing cases); *see also Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019) ("There is a 'strong equitable presumption against the grant of a stay where a claim could have been brought at

such a time as to allow consideration of the merits without requiring entry of a stay.'" (quoting *Nelson v. Campbell*, 541 U.S. 637, 650 (2004))).

Nor is BRIDGE helped by its claim (at 19) that it filed suit "[o]nce it was clear that CFPB would not withdraw the Rule." That is a concession that BRIDGE knew for months that the Rule might go into effect but declined to act to ward off the injuries it now claims (at 27) will be "catastrophic." There was no reason why, if BRIDGE's members were facing an imminent "catastrophic" threat necessitating preliminary relief, BRIDGE could not have sued when the Bureau first issued the Rule while still holding out hope that the Bureau would reverse course. Were it otherwise, "then the necessity of moving expeditiously … could be brushed away and the irreparable harm prong could be eliminated by a lawyer citing a good faith" need to wait and see. *Tech Traders, LLC v. Insuladd Env't, Ltd.*, No.6:18-cv-754-Orl-40GJK, 2018 WL 5830568, at *3 (M.D. Fla. Nov. 7, 2020).

Besides, even if BRIDGE's dilatory approach to this litigation were ignored, BRIDGE would still require no *preliminary* relief. A "preliminary injunction is meant to keep the status quo for a merits decision." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022). But here, all indications are that the district court will issue a *final* "merits decision" on BRIDGE's claims in advance of the March 1 deadline that BRIDGE says is critical. The district court has both "clearly articulated [its] intention" to resolve BRIDGE's claims before that date,

App'x.0573, and followed through on that commitment. Specifically, it has already held oral argument and ordered and obtained proposed orders from both parties. *See* Supp. App'x.0009–10. BRIDGE's asserted injuries from denial of preliminary relief are therefore entirely speculative and insufficient to justify reversing the district court here. *See Swain*, 961 F.3d at 1292 ("As we have emphasized on many occasions, the asserted irreparable injury must be neither remote nor speculative." (citation omitted)).

## III. The remaining factors weigh against preliminary relief.

The remaining balance-of-the-harms and public-interest factors "merge" when "the Government is the opposing party." *Swain*, 961 F.3d at 1293. The public interest is particularly acute when furthered through a legislative enactment, as preliminary relief "interfere[s] with the democratic process and lack[s] the safeguards against abuse or error that come with a full trial on the merits[.]" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. Here, the remaining factors weigh against an injunction.

Congress enacted and amended TILA to promote the "informed use of credit" through "meaningful disclosure of credit terms," 15 U.S.C. § 1601(a), and ensure that consumers are offered and receive residential mortgage loans that reasonably reflect their ability to repay those loans, *id.* § 1639b(a)(2). Moreover, Congress wanted these protections to apply to newly "devised" credit transactions,

including those that creditors would "characterize" as "fall[ing] one step outside [the] boundary Congress attempted to establish" in TILA. *Mourning*, 411 U.S. at 364–65. And EGRRCPA reflects Congress's specific judgment that PACE transactions must be governed at least by certain of TILA's protections for mortgage loans. 15 U.S.C. § 1639c(b)(3)(C).

The PACE Rule implements these important goals by applying TILA's protections to this new kind of credit transaction notwithstanding BRIDGE's attempt to sidestep uniform national consumer protections. PACE financing is credit—mortgage credit at that, where a consumer's failure to repay puts him at risk of losing his home. The Rule's application of TILA's guardrails for mortgage credit fulfills Congress's mandate.

The balance of equities thus weighs in favor of denying BRIDGE's motion.

## CONCLUSION

For the foregoing reasons, BRIDGE's appeal should be denied.

Dated: January 22, 2026

Respectfully submitted,

/s/ Joseph Frisone
Joseph Frisone (VA Bar No. 90728)
Derick Sohn (DC Bar No. 1003386)
*Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Joseph.Frisone@cfpb.gov
Derick.Sohn@cfpb.gov
(202) 435-9287 (Frisone)
(202) 435-7873 (Sohn)

MARK PAOLETTA
*Chief Legal Officer*
DANIEL SHAPIRO
*Deputy Chief Legal Officer*
VICTORIA DORFMAN
*Senior Legal Advisor*
CHRISTOPHER DEAL
*Deputy General Counsel for Litigation*
ANDREA MATTHEWS
*Assistant General Counsel for Litigation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the brief exempted by Fed. R. App. P. Rule 32(f), this brief contains 10,965 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 and 14-point Times New Roman font.

January 22, 2026 /s/ Joseph Frisone