**No. 25-14109**

# In the United States Court of Appeals for the Eleventh Circuit

BUILDING RESILIENT INFRASTRUCTURE & DEVELOPING GREATER EQUITY, INC.,
*Plaintiff-Appellant,*

v.

CONSUMER FINANCIAL PROTECTION BUREAU *and* RUSSELL VOUGHT, *in his official capacity as Acting Director, Consumer Financial Protection Bureau,*
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:25-cv-1367 (Barber, J.)

## PLAINTIFF-APPELLANT'S REPLY BRIEF


JOHN S. GIBBS III
ALEXANDER J. HILL
TROUTMAN PEPPER LOCKE LLP
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3000
evan.gibbs@troutman.com
alexander.hill@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
carson.cox@troutman.com

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 4

I. BRIDGE Established A Strong Likelihood Of Success .......... 4

A. The Rule Exceeds CFPB's Statutory Authority .......... 4

B. CFPB's Reliance On The PACE Report Was Arbitrary And Capricious .......... 17

C. The Rule Also Violates The Tenth Amendment .......... 21

II. A Preliminary Injunction Is Necessary To Prevent BRIDGE's Members From Suffering Irreparable Harm .......... 27

III. All Other Equitable Considerations Strongly Favor Granting Injunctive Relief .......... 31

CONCLUSION .......... 32

## TABLE OF CITATIONS*

### Cases

*Arizona Public Service Company v. Snead*,
441 U.S. 141 (1979) ........................................................ 26, 27

*Bidi Vapor LLC v. FDA*,
134 F.4th 1282 (11th Cir. 2025) ........................................ 18, 21

**Bilski v. Kappos*,
561 U.S. 593 (2010) .......................................................... 4, 6

*Burk v. Augusta-Richmond Cnty.*,
365 F.3d 1247 (11th Cir. 2004) .............................................. 3

*Burke v. Renew Fin. Grp., Inc.*,
No.2:21-CV-2938, 2021 WL 5177776 (C.D. Cal. Aug. 13, 2021) ......... 16

*Callaway v. Block*,
763 F.2d 1283 (11th Cir. 1985) .............................................. 3

*Concepcion v. Ygrene, Inc.*,
No.19-CV-1465, 2020 WL 1493617 (S.D. Cal. Mar. 27, 2020) ............ 16

*DeKalb County v. Federal Housing Finance Agency*,
741 F.3d 795 (7th Cir. 2013) ............................................ 25, 26

*Florida v. Becerra*,
544 F. Supp. 3d 1241 (M.D. Fla. 2021) ...................................... 31

**In re Hero Loan Litig.*,
Nos.ED-CV-1602478, *et al.*,
2017 WL 3038250 (C.D. Cal. 2017) ................................ 11, 14, 16

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .......................................................... 10

* Citations upon which Plaintiff-Appellant primarily relies are marked with asterisks.

*Lane County v. Oregon*,
74 U.S. 71 (1869) ........ 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 5, 7

*Meriwether v. Garrett*,
102 U.S. 472 (1880) ........ 22, 23

*Midland States Bank v. Ygrene Energy Fund Inc.*,
564 F. Supp. 3d 805 (E.D. Mo. 2021) ........ 24

*Montgomery County Commission v. Federal Housing Finance Agency*,
776 F.3d 1247 (11th Cir. 2015) ........ 25, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 19, 20

*Mourning v. Family Publications Services, Inc.*,
411 U.S. 356 (1973) ........ 7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........ 6

*Reno v. Condon*,
528 U.S. 141 (2000) ........ 27

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ........ 31

*Solantic, LLC v. City of Neptune Beach*,
410 F.3d 1250 (11th Cir. 2005) ........ 3

*Tug Allie-B, Inc. v. United States*,
273 F.3d 936 (11th Cir. 2001) ........ 6

**Statutes and Rules**

12 U.S.C. § 5602 ........ 16

15 U.S.C. § 1601 ........ 1

15 U.S.C. § 1602 .......... 13, 14

*15 U.S.C. § 1639c .......... 1, 4, 9, 10, 11, 20

28 U.S.C. § 1341 .......... 24

Fed. R. App. P. 4 .......... 30

Fla. Stat. § 163.081 .......... 16

**Regulations**

46 Fed. Reg. 50288 (Oct. 9, 1981) .......... 11

78 Fed. Reg. 6408 (Jan. 30, 2013) .......... 11

*90 Fed. Reg. 2434 (Jan. 10, 2025) .......... 1, 8, 13, 18, 20

## INTRODUCTION

As Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc. ("BRIDGE") explained in its Opening Brief, Dkt.20 ("Op.Br."), the Property Assessed Clean Energy ("PACE") Rule, *see* Residential Property Assessed Clean Energy Financing (Regulation Z), 90 Fed. Reg. 2434 (Jan. 10, 2025) ("Rule"), is unlawful in multiple respects, including because it exceeds the Consumer Financial Protection Bureau's ("CFPB") statutory authority under 15 U.S.C. § 1639c(b)(3)(C)(ii) ("Section 307").

CFPB's Response Brief, Dkt.25 ("Resp."), attempts to run away from Section 307—the provision that addresses the relationship between PACE and the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq*. ("TILA")—claiming that CFPB promulgated the Rule instead under its generic TILA rulemaking authority. But the dispute here has nothing to do with CFPB's generic rulemaking authority; it concerns whether CFPB exceeded its statutory authority as to PACE, where Congress instructed in Section 307 that CFPB adopt a rule that achieves certain, limited TILA purposes. As to which, CFPB offers no cogent explanation for why Congress enacted Section 307 if all TILA provisions (and other federal

statutes) already applied to PACE under TILA's 1968 definition of consumer credit. But even putting Section 307 aside, CFPB cannot explain how a person is a "debtor" under TILA's 1968 "consumer credit" definition, when PACE is a tax assessment that runs with the property to whomever owns the home (just like any other property tax obligation), is not reported to any credit bureaus, and imposes no personal obligations on the homeowner.

As to the equities, CFPB does not contest any of the evidence showing that BRIDGE's members will continue to suffer unrecoverable harms from spending hundreds of thousands of dollars to comply with the Rule by its March 1 effective date combined with the fact that residential PACE companies will lose 70–78% of their funding volume after that date. CFPB can cite no case suggesting that BRIDGE's reasonable decision to wait a brief period to see if it could resolve this dispute without litigation means that its members must suffer irreparable harm indefinitely. CFPB also asks this Court to deny this relief because it hopes that the District Court will issue a final decision by March 1. Yet there is no assurance that the District Court will issue its final merits decision by March 1, let alone sufficiently before that date

to permit BRIDGE to seek emergency relief from this Court if it does not prevail below. Notably, BRIDGE has done everything possible to expedite the resolution of this appeal, including filing its Opening Brief a week early and this Reply nearly two weeks early.

More generally, given the passage of time in these proceedings—now nine months since BRIDGE filed its preliminary injunction motion—BRIDGE respectfully asks this Court to adjudicate the merits of BRIDGE's underlying claims in the context of this appeal. After all, the parties' briefing here has fully vetted the merits issues in this case. *See, e.g.*, *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1273–74 (11th Cir. 2005) (deciding the merits of the case in an appeal of a preliminary injunction motion because the case involved a question of law and thus directing the district court as to the correct legal conclusions); *Callaway v. Block*, 763 F.2d 1283, 1287 & n.6 (11th Cir. 1985) (similar); *accord Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1257 (11th Cir. 2004). BRIDGE's members have already suffered substantial, unrecoverable harms by being forced to prepare to comply with the Rule for months. They should not have to also suffer the loss of

most of their funding volume on March 1, while they continue to await resolution of their meritorious challenge to this clearly unlawful Rule.

## ARGUMENT

### I. BRIDGE Established A Strong Likelihood Of Success

#### A. The Rule Exceeds CFPB's Statutory Authority

1. Acting in the face of a uniform understanding that TILA did not apply to tax assessments like PACE, Congress enacted Section 307 to require CFPB to achieve "the purposes of" TILA's ability-to-repay and associated liability provision "with respect to" PACE. Op.Br.35–37 (quoting 15 U.S.C. § 1639c(b)(3)(C)(ii)). The Rule vastly exceeds that limited authority by applying essentially all TILA provisions, as well as RESPA and the SAFE Act, to PACE. Op.Br.31–42. Further, arbitrarily reading TILA as already covering PACE under its 1968 definition of "credit," as CFPB did in the Rule, would mean that every PACE transaction since PACE began has been illegal without anyone noticing. That would render Section 307 nonsensical—violating multiple canons of statutory construction, including as articulated in *Bilski v. Kappos*, 561 U.S. 593 (2010). Op.Br.37–39. But even putting Section 307 aside, reinterpreting TILA's 1968 definition of consumer credit to cover PACE was never "the best reading," as every court and authority to have

considered the issue historically concluded. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024); *see* Op.Br.39–42. Because PACE imposes tax assessments *on property* rather than personal debts *on individuals*, it does not involve a "debtor" and thus lacks an essential feature of TILA "credit." Op.Br.39–42.

2. CFPB's arguments in its Response Brief fail as to Section 307, *infra* pp.5–12, and would be unpersuasive even if this Court analyzes this case without regard to Section 307, *infra* pp.13–17.

a. <u>Section 307</u>. CFPB tries to run away from Section 307 by claiming it adopted the Rule not under Section 307, but under "its longstanding rulemaking authority under TILA." Resp.21. CFPB fails to offer a coherent answer to the point that reading TILA's 1968 definition of "credit" to cover PACE would mean that all TILA provisions, including the ability-to-repay provision, already applied to PACE by automatic operation when Congress enacted Section 307 in 2018, rendering this statutory provision a nonsensical nullity. Adopting that approach would be contrary to multiple canons of statutory interpretation, including *Bilski*'s "canon against interpreting any statutory provision in a manner that would render another provision superfluous," even where "Congress

enacted the provisions at different times," 561 U.S. at 607–08, and the canons that where statutory provisions concern the same subject the more specific governs, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), and the more recent controls, *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 941 (11th Cir. 2001).

CFPB's failed attempt to distinguish *Bilski*'s principle, Resp.30–32, is revealing. CFPB claims that *Bilski*'s reasoning does not apply because CFPB relied on "its general rulemaking authority" and *Bilski* "does not address agency rulemaking authority." Resp.31. But the legal dispute here has nothing to do with CFPB's general rulemaking authority. The issue here is a *de novo* statutory question for the courts under *Loper Bright*, involving the interaction between Section 307 and TILA's 1968 definition of consumer credit. One of the key issues in conducting that *de novo* statutory analysis is whether it is permissible to read an old statutory definition so capaciously as to render a new statutory provision nonsensical. *Bilski* resolves that question of statutory interpretation, holding that courts cannot read an old definition in a prior-enacted statute (here, TILA's definition of "credit") to render language in a later-enacted statute (here, Section 307) a nullity. 561 U.S. at 607–08.

That the legal dispute here has nothing to do with CFPB's general rulemaking authority renders CFPB's discussion of cases about the purpose of such authority, Resp.21–22, irrelevant. CFPB relies on *Mourning v. Family Publications Services, Inc.*, 411 U.S. 356 (1973), for the proposition that Congress gave the Federal Reserve Board of Governors ("Board") and now CFPB the "rulemaking authority" to "clarify" that new forms of credit transactions "devised" after TILA's enactment "meet[ ] TILA's longstanding definition of consumer 'credit.'" Resp.21–22. But CFPB cannot invoke its rulemaking authority to *change* the meaning of TILA's statutory text, whether to "clarify" that text or not. *See Loper Bright*, 603 U.S. at 400–01, 409. Rather, it is this Court's duty to determine whether the Rule is lawful by giving the statutory phrases their "best reading," without deferring to the agency's preferred interpretation, *id.* at 400; *see id.* at 392 & n.4—here, the relationship between Section 307 and TILA's 1968 definition of "credit."

CFPB's attempt to manufacture a purpose for Congress enacting Section 307 in 2018 if TILA already applied to PACE under the 1968 definition, Resp.30–32, falls flat. CFPB claims that even though it was "already *authorized* to regulate PACE transactions as credit" pursuant

to "its general rulemaking authority," Section 307 is not "redundant" because it "*require[d]*" CFPB to issue a rule doing so. Resp.30. But CFPB's position is that PACE falls within TILA's *1968* definition of "credit" and thus has *always* been "subject to" TILA since PACE began in 2008, meaning that TILA's existing regulations already applied to PACE. *See* 90 Fed. Reg. at 2449. CFPB speculates that perhaps another purpose of Section 307 may have been to "preclude[ ] [CFPB] from exempting PACE transactions from TILA's ability-to-repay and associated civil liability provisions." Resp.31. But CFPB stated in the Rule that PACE "meet[s] the statutory definition of credit" under TILA, 90 Fed. Reg. at 2449—established in 1968—meaning that, in CFPB's view, TILA's "existing statutory and regulatory regime governing residential mortgage loans," including "TILA's ability-to-repay regime" already applied to PACE, *id.* at 2465. If Congress merely wanted to ensure that CFPB applied TILA's ability-to-repay requirements to PACE, under CFPB's view, Congress would have needed to do *nothing*. Giving one more shot, CFPB asserts that Section 307 authorized it "to extend TILA's civil liability provision to PACE companies" by instructing CFPB to "account for [PACE] financing's unique nature." Resp.31. But, under

CFPB's view, it would have already been allowed as an exercise of its generic rulemaking authority to "clarify" that new forms of "financing meet[ ] TILA's longstanding definition of consumer 'credit'" and to promulgate regulations that "carry out [TILA's] purposes" with respect to those transactions. Resp.21–22.

CFPB's claim that Section 307 "reinforce[s]" its interpretation, Resp.25, fails. CFPB argues that its authority to apply other provisions (and statutes) to PACE outside of TILA's ability-to-repay and civil liability provision is reinforced by Congress "plac[ing] Section 307" "in TILA" and in "a section regulating mortgage credit." Resp.25. But that placement does not show that Congress intended TILA "credit" to cover PACE nor did Congress determine PACE is a mortgage. Placing Section 307 within TILA supports what Congress said in Section 307: CFPB must issue a rule "carry[ing] out the purposes" of one TILA provision "with respect to" PACE that "account[s] for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). That limited mandate only makes sense if Congress understood that TILA's provisions, including the ability-to-repay provision, did not already apply to PACE.

CFPB asserts that Section 307's "language" "presupposes" that PACE "is mortgage credit" by instructing CFPB to promulgate rules that "apply" TILA's civil liability provision "with respect to violations under" TILA's ability-to-repay provision. Resp.26. CFPB argues that because those provisions only apply to "residential mortgage loans"—which constitute TILA "credit"—Section 307's instruction to "carry out the purposes" of those provisions "with respect to" PACE indicates Congress' intent to consider PACE "residential mortgage loans" and thus "credit." 15 U.S.C. § 1639c(b)(3)(C)(ii); Resp.26. Section 307's text defeats any such suggestion. Section 307 directs CFPB to issue a rule that accomplishes "*the purposes of*" TILA's ability-to-repay and associated liability provision "*with respect to*" PACE, 15 U.S.C. § 1639c(b)(3)(C)(ii) (emphases added), "broadening" TILA's scope to include some regulation of PACE in a specific respect that was not permissible prior to Section 307, *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018).

CFPB cannot explain away "the uniform understanding that PACE was *not* consumer 'credit' under TILA" against which Congress enacted Section 307. Resp.27–28. Before the Rule, the Board, CFPB itself, all PACE administrators, and all courts to have considered the issue all

understood that PACE does *not* constitute "credit" under TILA. Op.Br.11–14, 35–37. CFPB attempts to downplay that the Board's official staff commentary to Regulation Z "except[ed] tax liens and tax assessments from TILA's definition of 'credit'" because it did so "in 1981," when it apparently only knew about "involuntary" tax assessments. Resp.28. But the Board was surely aware of longstanding forms of voluntary tax assessments, such that its exemption for *all* "tax assessments" from TILA "credit" included both involuntary and voluntary taxes. 46 Fed. Reg. 50288, 50292 (Oct. 9, 1981); *see* App'x.240–01 (providing examples of "'voluntary' tax assessments other than PACE assessments" "that have never been regarded as consumer credit"); *In re Hero Loan Litig.*, Nos.ED-CV-1602478, *et al.*, 2017 WL 3038250, at *3–4 (C.D. Cal. 2017). In any event, CFPB adopted the Board's commentaries ***in 2011***—after PACE began—reaffirming that "tax liens" and "assessments" did not qualify as TILA "credit." *Hero*, 2017 WL 3038250, at *3; *see* 78 Fed. Reg. 6408, 6410–13 (Jan. 30, 2013).

Finally, as to Section 307's directive to "account for the unique nature of [PACE]," 15 U.S.C. § 1639c(b)(3)(C)(ii), CFPB asserts that it "tailored" TILA's requirements to "each factor" unique to PACE by

making "appropriate" adjustments. Resp.32–33. Not so. CFPB claims that it "tailor[ed]" TILA's "civil liability scheme to PACE" to extend "liability to PACE companies," thus accounting for PACE creditors being "local government entit[ies]." Resp.33. But making *private* PACE administrators liable "for violations of TILA's ability-to-repay provision," Resp.33, does not address the serious sovereignty-based concerns raised by subjecting PACE's *government* sponsors—which CFPB has confirmed is the local government or a government entity operating with the authority of several local governments—to the Rule's onerous *federal* requirements, *see, e.g.*, App'x.181–82, 252–55. CFPB also claims that it tailored the Rule's ability-to-repay provision to account for PACE assessments being "repaid alongside property taxes" by directing PACE administrators to "consider the timing of a consumer's first PACE loan repayment" if they are paying "through an escrow account for an existing mortgage." Resp.34. But *adding* that requirement does not carry out Section 307's mandate. *See, e.g.*, App'x.242–63 (suggesting ways that CFPB could have carried out the mandate); App'x.93–95 (same).

b. TILA's 1968 Definition If Section 307 Was Not Enacted. Even putting Section 307 aside, CFPB's defense of its position that PACE "meet[s] th[e] definition" of "credit" under TILA, Resp.29, fails.

PACE cannot be "credit" under TILA because it imposes a tax assessment on property rather than creating a personal debt for a debtor. Op.Br.39–42. TILA "credit" requires "a creditor" to extend debt to "a debtor," who must be a natural person, thereby causing that natural-person debtor to incur a debt-repayment obligation. Op.Br.39–40; 15 U.S.C. § 1602(f), (i). PACE lacks the critical feature of TILA "credit" because it involves no debtor. Op.Br.40–41. CFPB does not dispute that: (1) PACE assessments are "tied to *the property*, not the property owner," 90 Fed. Reg. at 2435 (emphasis added); Resp.23; (2) "the obligation to pay" a PACE assessment "attaches to and runs with the property," Resp.23–24; (3) lenders cannot hold a homeowner personally liable for failing to pay PACE assessments, Resp.24; (4) PACE assessments are paid and collected "alongside property taxes," Resp.23; (5) PACE assessments do not constitute personal debt under state law, *see* Resp.22–25; Op.Br.40–41; and (6) PACE assessments are not reported to

credit bureaus and "do not appear on consumer's credit reports," Resp.39–40. These concessions by silence are fatal to CFPB's position.

CFPB attacks a strawman by falsely claiming that BRIDGE is arguing that "the property [ ] is the 'debtor'" in a PACE assessment. Resp.23. But not *every* "transaction" *must* have a "'debtor' for purposes of TILA." *Contra* Resp.23. Many transactions—and, indeed, all property tax assessments—have no TILA debtor. *See Hero*, 2017 WL 3038250, at *3 (providing examples of "*other* voluntary transactions" that "CFPB has excluded . . . from the definition of 'credit'"). Far from arguing that "the property" qualifies as a "'debtor'" under TILA, *contra* Resp.23, BRIDGE noted that "'a debtor'" for purposes of TILA "'credit'" must be "a '*natural person*,'" which a home clearly is not, Op.Br.39 (quoting 15 U.S.C. § 1602(f), (i) (emphasis added)).

CFPB's claim that those who sign PACE contracts are TILA "debtor[s]," Resp.23–25, misses the mark. CFPB notes that property owners are "offered the loans and sign the financing agreements" that result in their properties incurring PACE assessments. Resp.22–25. But signing an agreement that the owner of property will pay more taxes for a certain period does not make someone a "debtor" under TILA; the

agreement must create some personal liability on that individual's behalf to repay a debt, which PACE does not do. Op.Br.39–42. CFPB tries to avoid this by claiming that the homeowner "is obligated to pay the PACE loan" and may "suffer [ ] consequences" for not repaying, Resp.24, but "the obligation to pay the assessment *runs with* title to *the property*" and "*passes* to the future owners of the property" and "if the homeowner does not pay the assessment, the lender's remedy is" *against "the house* rather than . . . against the homeowner," Resp.24 (emphases added). The owner subject to a PACE assessment has no personal liability to repay the assessment and failing to repay the assessment does not affect the owner's credit score. Thus, an owner cannot be a "debtor" within the meaning of TILA "credit." Op.Br.40–41.

CFPB notes that TILA "treats other nonrecourse obligations" like "nonrecourse reverse mortgages" or "effectively nonrecourse" mortgages as "credit." Resp.24. But those products differ from PACE in material respects, including that none involves a tax assessment that runs with the property. Whether TILA "credit" covers credit products that do not involve tax assessments that run with the property, having their own unique features and repayment structures, is irrelevant here, and have

their own complications. To take just one example of these complications that CFPB ignores, 12 U.S.C. § 5602(c) expressly recognized CFPB's preexisting authority over reverse mortgages.

CFPB claims "it does not matter that the obligation to pay the assessment runs with title to the property," Resp.24, but that point is fatal to CFPB's position, *see* Op.Br.39–42, as noted by every court to have addressed this question of whether PACE qualifies as TILA "credit," *see* Op.Br.12–13; *Hero*, 2017 WL 3038250, at *3–4; *Burke v. Renew Fin. Grp., Inc.*, No.2:21-CV-2938, 2021 WL 5177776, at *3 (C.D. Cal. Aug. 13, 2021); *Concepcion v. Ygrene, Inc.*, No.19-CV-1465, 2020 WL 1493617, at *4 (S.D. Cal. Mar. 27, 2020). Nor do BRIDGE's members' PACE contracts show otherwise. *Contra* Resp.25. That the PACE contracts provide that the "Property Owner" has "the obligation to pay the Assessments" levied against the home, Resp.25, only confirms that PACE does not create any debtor with personal liability to repay PACE assessments under state law, *see Hero*, 2017 WL 3038250, at *3; Fla. Stat. § 163.081(1)(e). Whoever happens to be the "Property Owner" of a home subject to a PACE assessment at any given time must pay that assessment—*exactly like that person must pay every property tax on that home.* No one familiar

with the English language would say that someone is a "debtor" to the State or locality because he or she must pay his or her tax obligations.

### B. CFPB's Reliance On The PACE Report Was Arbitrary And Capricious

1. The Rule is arbitrary and capricious because CFPB relied extensively on the fatally flawed PACE Report. Op.Br.43–49. Three defects each independently render that Report arbitrary. Op.Br.44–49; *see also* App'x.373–81. First and most problematically, the Report's control group renders the Report's findings meaningless because the Report compares PACE users to a control group of consumers who were approved for PACE but chose not to proceed with PACE; meaning many did not fund projects at all with tax assessments or consumer loans. Op.Br.44–46. Second, the Report fails to account for the sweeping state-level PACE reforms that significantly improved PACE outcomes because most homeowners included in the Report's dataset applied for PACE *before* these reforms took effect. Op.Br.46–48. Finally, the Report excluded nearly 25% of the relevant PACE applicants whose credit histories CFPB could not locate. Op.Br.48–49.

2. CFPB first asserts that it "did not rely on the report in making any of the decisions BRIDGE challenges in this suit," Resp.19; *see*

Resp.36, 40–41, but CFPB relied extensively on the Report as "data-based support" for the Rule—not merely to quantify impacts. App'x.81; *see* App'x.214–26; 90 Fed. Reg. at 2476–82; *see generally* 90 Fed. Reg. 2434 (citing the "PACE Report" over 200 times). The Report supplied the record for the Rule, including whether or how homeowners were repaying the PACE assessments, repayment rates, assessment amounts, and the effect of existing state-level PACE reforms. And even if CFPB could now disown the Report, that would invalidate the Rule by leaving the Rule without *any* "data-based support," App'x.81, and thus without the APA-required "examin[ation of] the relevant data and articulat[ion of ] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Bidi Vapor LLC v. FDA*, 134 F.4th 1282, 1286 (11th Cir. 2025) (citations omitted).

CFPB has no serious defense for the Report's fatally flawed control group. CFPB insists without citation that using non-PACE funding methods as comparators would "ignore[ ]" the impact of inducing consumers into undertaking home-improvement projects they otherwise would not have taken or into financing projects they might have paid for with cash. Resp.37. But CFPB offers no explanation for how *only*

PACE—but not other home-improvement funding methods—causes those impacts. The Report correctly explains that the control group and test group must have similar characteristics, *see* Supp.App'x.43–44; CFPB failed the Report's own test by comparing consumers in "materially different financial positions," Op.Br.44–45, and by analyzing a control group with "differences in characteristics," Supp.App'x.43.

CFPB also suggests that BRIDGE's "alternate control group" of consumers who utilized other funding methods would have been "too small," Resp.38, but that is no excuse for CFPB including the "[ir]relevant" group of consumers who did not fund their projects at all in its control group, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see* Op.Br.44–45. And CFPB's complaint that the "alternate group" would have been comprised of consumers who had "higher credit scores and dramatically lower pre-PACE delinquency rates," Resp.38, only further demonstrates that CFPB filled its control group with consumers who did not pursue or fund projects at all—and thus incurred no additional loan *or* tax payment obligations—to skew the Report's findings to its desired outcome, Op.Br.44–46.

CFPB defends the Report's lack of "any data about Florida's 2024 reforms" and the "limited and 'not statistically precise'" data concerning California's reforms by claiming that CFPB need not obtain "'perfect empirical or statistical data' before making a decision." Resp.38. But CFPB cannot fail to "account for the unique nature" of PACE, 15 U.S.C. § 1639c(b)(3)(C)(ii), or "fail[ ] to consider an important aspect of the problem" it seeks to regulate, *State Farm*, 463 U.S. at 43. By acknowledging that state-level PACE reforms "improved customer outcomes," 90 Fed. Reg. at 2441, and then basing its Rule on a dataset comprised mostly of consumers who entered PACE before California's reforms took effect and entirely of consumers who entered PACE before Florida's reforms, Op.Br.46–48, CFPB acted unlawful.

CFPB then characterizes BRIDGE's objection that the Report's (flawed) finding of a negligible 2.5-percentage-point difference between the PACE group and the control group cannot justify the overly burdensome Rule, Op.Br.47–48, as a disagreement over "the relative importance of regulating PACE" that this Court cannot resolve, Resp.39. But this Court must determine whether CFPB complied with the APA's requirement to "articulate[ ] a satisfactory explanation for its action

including a rational connection between the facts found and the choice made." *Bidi Vapor LLC*, 134 F.4th at 1286 (citation omitted). It was arbitrary and capricious for CFPB to impose the burdensome Rule based on a meager 2.5-percentage-point deviation between flawed control and test groups that returns to the median within three years of the first PACE payment and largely ignores the positive impacts of States' PACE reforms. *See id.*; Supp.App'x.63–64; App'x.116–17, 120–21.

Finally, CFPB blithely chalks up the Report's failure to include 22% of PACE applicants in its control group because it could not locate their credit histories, Op.Br.48–49, to "data issues," Resp.39–40. But the APA does not allow CFPB to proceed based on flawed data because reliable data is unavailable. *Supra* pp.18–20.

**C. The Rule Also Violates The Tenth Amendment**

1. The Rule violates the Tenth Amendment in two respects. Op.Br.49–60. PACE programs are an exercise of States' sovereign taxing authority because PACE is a state-authorized tax assessment imposed by local governmental entities on real property to achieve States' sovereign policy objectives. Op.Br.55–57. The Rule unconstitutionally infringes upon that taxing authority by restricting States' power to

impose those tax assessments. Op.Br.55–57. The Rule also violates the Tenth Amendment's anticommandeering principle by compelling States to run their state-authorized PACE programs by enforcing federal regulatory requirements. Op.Br.58–59.

2. CFPB's counterarguments, Resp.41–45, fail to show otherwise.

None of the cases that CFPB selectively quotes supports its theory that "PACE loans" cannot be a "tax" because they "are created voluntarily." Resp.42. Contrary to CFPB's assertions, Resp.41–42, taxes can exist as voluntary or contractual arrangements.

CFPB takes one snippet from *Meriwether v. Garrett*, 102 U.S. 472 (1880), Resp.41, but that quote was limited to a specific scenario and still provides that taxes can be voluntary. *Meriwether* concerned creditors of the bankrupt City of Memphis who wished to compel the city to levy taxes to repay debt Memphis owed to the creditors. 102 U.S. at 507. The question before the Supreme Court was whether uncollected taxes were considered the property of Memphis such that "a court of equity will lay hold of and apply to the payment of its debts." *Id.* at 513. Since Memphis had uncollected taxes, whether Memphis's uncollected taxes were "debt" was important to creditors' recoveries from Memphis, *see id.* at 513–514,

and so *Meriwether* defined a tax for the limited context of municipal debt collection. Two other points in *Meriwether* are worth emphasizing. *Meriwether* explains that "[t]axes are imposts levied for the support of the government, or for some special purpose authorized by it." *Id.* at 513–14. PACE programs meet that test, as they are imposts levied for support of state objectives and for a special purpose the State authorized. Op.Br.6–8. *Meriwether* also recognizes a category of taxes where "the tax provided is so connected with a contract, as the inducement for [the contract's] execution," but that "[i]t is not of such taxes . . . that [*Meriwether* is] speaking, but of ordinary taxes." 102 U.S. at 514. This explains a reason that PACE tax assessments are taxes, even though they are "connected with a contract." *Id.*; Op.Br.6–8.

Likewise, CFPB's assertion that *Lane County v. Oregon*, 74 U.S. 71 (1869) suggests contracts cannot be connected to taxes, Resp.41–42, is incorrect; *Lane* was explaining that "liabilities for taxes [are not] debts" (besides, CFPB's quote is from a New Jersey case which *Lane* quotes), 74 U.S. at 79–80.

CFPB asserts that taxes must be "levied on the general public for revenue-raising purposes," Resp.42, and claims that *Midland States*

*Bank v. Ygrene Energy Fund Inc.*, 564 F. Supp. 3d 805 (E.D. Mo. 2021), supports that position. *Midland* does not help CFPB because its analysis occurred solely "in the context of the [Tax Injunction Act ("TIA"), 28 U.S.C. § 1341]," where the question pertained to "the congressional intent . . . of the TIA," 564 F. Supp. 3d at 813, and "tax under [that specific] State['s] law," 28 U.S.C. § 1341. Even if CFPB's uncited tax definition was applicable, members of "the general public," Resp.42, may enter PACE tax arrangements after meeting specified requirements, Op.Br.6–8, 13–14, and such taxes pay for improvements that reduce disaster-related and energy costs that benefit the public (in the State's sovereign judgment), similar to the taxes of community improvement districts and the like, *see* Op.Br.6–7.

CFPB further suggests that even if the Rule implicates state taxing authority, it does not violate the Tenth Amendment because it "merely regulates states as market participants," Resp.19, and does not meaningfully affect States' taxing power, Resp.42, or because Congress preempted States' taxing authority in this area under the Commerce Clause by enacting Section 307, Resp.42–43. Both arguments are wrong.

To begin, both of the cases that CFPB cites to support superseding State taxation authority involve a specific, circumscribed scenario not present here. *Montgomery County Commission v. Federal Housing Finance Agency*, 776 F.3d 1247 (11th Cir. 2015), concerned States' ability to tax an instrumentality of the federal government or other entity by "constitutional immunity or congressional exemption," not whether the federal government could interfere with state tax powers that do not tax federal instrumentalities or other federally protected entities. *Id.* at 1259–60. *DeKalb County v. Federal Housing Finance Agency*, 741 F.3d 795 (7th Cir. 2013), involved substantively the same facts and analysis as *Montgomery* but makes this Fannie/Freddie line of cases even more distinct from PACE tax assessments: the federal statute superseding the state real estate transfer tax is permissible because the taxed entity "is a federal instrumentality." *Id.* at 802.

CFPB ignores that *Montgomery* "require[s] Congress to 'speak clearly when it intends to exercise its lawful authority under the Supremacy Clause to preempt traditional state powers' such as taxation." 776 F.3d at 1261 (citation omitted). Nowhere in Section 307 (or TILA) does Congress discuss superseding any part of state taxation

authority, and, as explained above, *supra* pp.6–12, Congress did not want CFPB to apply nearly all TILA provisions as well as portions of the SAFE Act and RESPA (including the parts of the Rule which violate the Tenth Amendment) to PACE. And while Section 307 violates the Tenth Amendment as well, the Rule violates that Amendment to a much greater extent because it goes far beyond what Congress sought to authorize in Section 307. *See supra* pp.6–12; *DeKalb County*, 741 F.3d at 802 ("The scope of the exemption in the Fannie Mae statute could not be clearer."). CFPB's suggestion that it does not matter whether taxable subjects or amounts are reduced under the Commerce Clause, Resp.44, misses the point. The taxable subject in *Montgomery* was a federal instrumentality specifically exempted by Congress. *See* 776 F.3d at 1259–60. Regardless, *Montgomery* does not hold or in dicta suggest that the appropriate test is whether taxable subjects are reduced. *Contra* Resp.44.

*Arizona Public Service Company v. Snead*, 441 U.S. 141 (1979), likewise does not help CFPB's argument because that case involved state taxation of energy that was being delivered to other States, where there was a federal law that "intended" to supersede state taxes on electricity

and forbid discriminatory taxes against out-of-state transmission (*i.e.*, interstate commerce). *Id.* at 149–50.

Finally, CFPB argues that there is no anticommandeering problem here because the Rule and Section 307 are "a generally applicable regulatory scheme" in which States are "voluntary participants," meaning the Rule and Section 307 apply to state and private commercial actors alike. Resp.44 (citing *Reno v. Condon*, 528 U.S. 141, 151 (2000)). But CFPB does not explain how private commercial actors could impose the *tax* assessments that form the basis for PACE—a unique state function. *See* Resp.44–45.

## II. A Preliminary Injunction Is Necessary To Prevent BRIDGE's Members From Suffering Irreparable Harm

A. BRIDGE presented uncontested evidence that its members will suffer massive irreparable financial injuries—including losing nearly three-fourths of their funding volume—if the Rule takes effect on March 1, 2026, which losses cannot be remedied by money damages due to sovereign immunity. Op.Br.61–64. BRIDGE's members have already suffered losses in the millions of dollars in the nine months since BRIDGE filed its Motion For Preliminary Injunction, with the worst of their irreparable injuries soon to come absent relief. Op.Br.61–64.

B. Unable to contest the undisputed evidence that BRIDGE submitted below showing that its members will suffer irreparable harm without a preliminary injunction, CFPB instead claims that such relief is unnecessary because BRIDGE has "displayed" a "lack of urgency," Resp.19; *see* Resp.46, and because the District Court will issue its final decision before the Rule's effective date, Resp.47–48.

BRIDGE had very good reason to assess whether a lawsuit challenging the Rule would be necessary at all before jumping into costly litigation. *Contra* Resp.47. A new Administration was set to take office in January 2026, and BRIDGE could not reasonably foresee that the Rule would be one of the few actions taken by the prior Administration's CFPB that the new CFPB would seek to enforce despite differing policy objectives and enforcement priorities. *See* Dkt.21 at 2; Dkt.8 at 21–22 n.2. Indeed, just three weeks after the Rule's finalization (and Administration change), CFPB announced that it was reassessing *all* actions the prior Administration's CFPB's took. Dkt.8 at 21–22 n.2. And CFPB informed multiple courts that it could not take a position on whether it would defend numerous recently issued rules, while suspending or withdrawing others. *Id.* CFPB would have this Court

penalize BRIDGE for not immediately rushing to court when it reasonably believed there was a strong chance of administrative relief. The perverse incentives of that holding are obvious, encouraging immediate litigation when administrative relief is likely, although not certain. Tellingly, the District Court *rejected* CFPB's argument that BRIDGE delayed filing suit and seeking its preliminary injunction. *Id.*

But even putting all of that aside, BRIDGE filed its lawsuit on May 28, 2025—over 9 months before the Rule is scheduled to take effect—and moved for a preliminary injunction a mere week later. Dkt.21 at 1–2. **CFPB does not cite any case, from any court, even suggesting, let alone holding, that a party filing an APA lawsuit and preliminary injunction motion nine months before the Rule's effective date is too late to get relief**, such that the aggrieved party must suffer whatever harms may come, no matter how long the courts take to rule on the final merits of the case.

As to BRIDGE's prosecution of this appeal, the District Court denied BRIDGE's Motion For Preliminary Injunction on November 3, 2025 and BRIDGE filed its appeal to this Court on November 19, App'x.8, more than two weeks ahead of its deadline to do so, *see* Fed. R. App. P.

4(a)(1)(A), and in the same little-over-two-week period BRIDGE also filed its Motion For Summary Judgment and its Time Sensitive Motion For Injunction Pending Appeal with the District Court, *see* App'x.8. Since then, BRIDGE has done everything possible to move this appeal quickly by filing its Motion For Injunction Pending Appeal with this Court the day after it docketed this appeal, Dkt.8; filing its merits brief on appeal a week ahead of schedule, *see* Dkts.17, 20; filing a Motion To Expedite, Dkt.21; and filing this Reply nearly two weeks ahead of schedule, *see* Dkt.17. The record belies CFPB's suggestion that BRIDGE has taken an "unhurried" or "dilatory approach to this litigation." Resp.47.

CFPB's hope that a preliminary injunction is unnecessary because the District Court "will issue a *final* 'merits decision'" before the Rule's March 1, 2026 effective date, Resp.47–48, does not change the equities calculus. The District Court has provided no date on which it will certainly enter final judgment and there is no way of knowing when that Court will do so—let alone that it will do so sufficiently in advance of the Rule's fast-approaching effective date so as to afford BRIDGE any realistic possibility of obtaining relief from this Court before March 1, should the District Court rule against BRIDGE. *See* Dkt.24 at 3–4.

## III. All Other Equitable Considerations Strongly Favor Granting Injunctive Relief

A. The balance of the equities and the public interest strongly favor enjoining the unlawful Rule. Op.Br.64–66. While neither the CFPB nor the public has an interest in enforcing an illegal regulation, the Rule threatens to rob States of the important public benefits that PACE offers their (often most vulnerable) homeowners and local communities by increasing the cost of PACE or making it entirely unavailable. Op.Br.65.

B. CFPB claims that the Rule should not be enjoined because it "would obstruct [CFPB's] lawful implementation of consumer protections that Congress applied to PACE transactions," Resp.20, and allow PACE to "sidestep" those consumer protection measures, Resp.48–49. But the Rule is *not* lawful, *supra* Part I, and does not "fulfill[ ] Congress's mandate," Resp.49, by subjecting PACE to burdensome federal requirements across numerous provisions and statutes not mentioned in Section 307, *supra* Part I.A. Neither the "public" nor CFPB has any "interest in the perpetuation of unlawful agency action." *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1304 (M.D. Fla. 2021) (citation omitted); *see Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). That is especially true where state law already provides substantial protections

and regulation of PACE financing, which laws CFPB has praised as beneficial to consumers. *Supra* p.20. All equitable factors favor enjoining an unlawful rule that threatens to shutter an industry, infringe upon States' sovereign taxing powers, and rob vulnerable, low-income homeowners in natural-disaster-prone States of a reliable method to fund critical, socially beneficial home-improvement projects. Op.Br.64–66.

## CONCLUSION

This Court should reverse the District Court's decision and remand for entry of an order preliminarily enjoining the Rule.

Dated: January 31, 2026

Respectfully submitted,

s/*Misha Tseytlin*

JOHN S. GIBBS III
ALEXANDER J. HILL
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street NE,
Suite 3000
Atlanta, GA 30308
(404) 885-3000
evan.gibbs@troutman.com
alexander.hill@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
CARSON A. COX
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240 (MT)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com
carson.cox@troutman.com

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,250 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

Dated: January 31, 2026

*s/Misha Tseytlin*
MISHA TSEYTLIN

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on January 31, 2026. I served all counsel of record by CM/ECF.

Dated: January 31, 2026

*s/Misha Tseytlin*
Misha Tseytlin

*Counsel for Plaintiff-Appellant Building Resilient Infrastructure & Developing Greater Equity, Inc.*